# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

Grafton School District,

                Plaintiff,

v.

                                          Case No. 19-cv-1179

J.L, a minor,
by and through his parent and next friend, L.L.,

                Defendant.

---

## COMPLAINT

Plaintiff, Grafton School District (the "District"), by and through its attorneys, brings this action seeking review and reversal under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, and its implementing regulations, 34 C.F.R. Part 300, of the Decision and Order issued by Administrative Law Judge Sally Pederson on July 1, 2019 as amended on July 18, 2019 (the "Decision and Order").[1] In support of this appeal the District states as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action under 28 U.S.C. § 1331, 20 U.S.C. § 1415(i)(2)(A), 34 C.F.R. § 300.512, and Wis. Stat. § 115.80(7).

2.      Venue in this federal district is appropriate because, on information and belief, the Defendants are residents of the State of Wisconsin and reside in this district. Venue is also

---

[1] A copy of the Decision and Order, redacted to comply with Fed. R. Civ. P. 5.2, is attached to this Complaint as Exhibit 1.

appropriate because this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. 28 U.S.C. § 1391(b)(1)-(2).

## THE PARTIES

3.    The District is a governmental entity authorized and existing under the laws of the State of Wisconsin, is a body corporate, and has its office located in Grafton, Wisconsin.

4.    L.L. (the "Parent") is a resident of the State of Wisconsin and is the parent of J.L. (the "Student").

## RELEVANT FACTS

5.    The Student is presently 17 years old and attended schools in the District through the open enrollment program beginning in the 2011-2012 school year, when the Student was in fourth grade, through the 2017-2018 school year, when the Student was in tenth grade. Although the Student excelled in certain subjects, such as math and science, while attending schools in the District, the Student experienced difficulty with writing.

6.    The Student has a high-average IQ, "shows superior range intelligence," and achieved success in his academics sufficient to allow him to progress to the next grade during each year he attended the District. The Student was viewed as a "good kid" while attending high school in the District, and did not have any behavioral referrals for physical confrontations.

## I.    Student's Evaluation for Special Education.

7.    At the end of Student's sixth grade year, in June 2014, the District conducted a special education evaluation of the Student. That evaluation determined that the Student was eligible for special education services, because he met the eligibility criteria for other health impairment ("OHI"), as the Student had been medically diagnosed with attention-deficit disorder and anxiety. An individualized education plan ("IEP") was developed for Student that included

2

special education services in the form of academic support in the special education classroom for one class period per day, as well as a number of supplementary aids and services.

8.    The IEP team continued to develop new IEPs for Student as Student progressed through the seventh and eighth grades at the District.

## II.    Evaluation and Creation of IEP Prior to High School.

9.    Prior to the start of his ninth grade year, Student was evaluated to determine if he met the eligibility criteria for a speech/language impairment. Susan Carneol ("Carneol"), an independent, certified and licensed speech and language pathologist, evaluated Student and prepared a written report in which she made a series of four recommendations:

1.    Continue with IEP under Other Health Impairment with direct intervention from the reading specialist or special education teacher on a program to improve spelling strategies and written expression. Outside tutors/resources with specific training and experience can be provided at the parent/school request.

2.    Consider adding speech and language as a related service to his IEP. [Student]'s test scores would not "qualify" him for speech and language impairment, but with an underlying language processing impairment (phonological processing), retrieval and formulation difficulties affecting oral and written expression, and social pragmatic weaknesses, [Student] would benefit from the support of an experienced speech-language pathologist. Therapy goals should include establishing active listening strategies, strategies to facilitate auditory working memory, semantic webbing to facilitate word retrieval, and social communication coaching.

3

3. [Student] would benefit from direct training in the use of graphic organizers as a way to organize verbal information for both comprehension (listening and reading) as well as verbal expression (oral and written). This can be done by the speech-language pathologist or special education teacher.

4. Close communication and collaboration between all support professionals and [Parent] should be maintained as coordination of goals and strategies are imperative to help [Student] succeed.

10.     The District subsequently held an evaluation and IEP meeting, in which Carneol participated, to develop an IEP for the 2016-2017 school year and to consider Student's eligibility for speech/language impairment. Parent also participated in the meeting. The IEP team determined that Student continued to meet the criteria for OHI "related to ADHD, Anxiety, and delayed written expression skills," but Student did not meet the criteria for a speech/language impairment.

11.     Carneol's report, as well as direct consultation between Carneol and the District, were used in setting Student's present levels of performance and the development of goals for the 2016-2017 school year to be incorporated in Student's IEP. Carneol recommended speech therapy twice per week at 20 minutes per session, as well as the use of a graphic organizer in connection with Student's speech and language goals.  The IEP team incorporated Carneol's speech therapy recommendation into Student's IEP as a related service, twice per week for 20 minutes.

12.     All of Carneol's recommendations were incorporated into the IEP, including therapy goals to establish active listening strategies, strategies to facilitate auditory working

4

memory, semantic webbing to facilitate word retrieval, and social communication coaching. The IEP also incorporated the use of graphic organizers.

13.     The IEP included four goals for the 2016-2017 school year, including goals with respect to organization, supported study hall, writing, and speech and language.

14.     The IEP for the 2016-2017 school year ultimately provided for Student to receive the following special education services: (1) targeted skill work in written language with grammar, structure and content in a class called Read to Succeed for 1 class period per day in the special education classroom; (2) supervised study for one class period per day in the special education classroom; and (3) an assignment notebook accuracy check at the end of each school day. The IEP also provided for related services of 20 minutes of speech and language therapy twice per week, as well as several supplementary aids and services.

15.     Student experienced success during his ninth grade year in the District. In Student's English 9/Literature 9 core class, for example, Student was able to demonstrate strong content understanding because of his strength in reading, and when given academic prompts with his writing, he was able to communicate his understanding of the written language process. Student required prompts, outlines, and reminders in order to be able to write, but upon being provided the support, Student was indeed able to demonstrate the intended skills. When Student was getting the supports he needed, Student completed all the assignments that the educators were asking him to do.

16.     The writing goals in Student's 2016-2017 IEP set forth that Student would write a paragraph that met the requirements for "Developing" on the District's high school grading rubric for communication arts. Throughout Student's ninth grade year, he was scoring in the developing and proficient range, and so he met his writing goal for the 2016-2017 school year.

5

Despite meeting the goal, the District was unable to discern a specific process that worked consistently for Student with respect to his writing, as strategies that worked really well in one situation may not be able to be replicated the next time in a similar situation. The District utilized a number of strategies to teach writing to the Student. As to his other writing goals for the 2016-2017 academic year, Student made progress toward his goals.

17.     Student also met his speech goals for the 2016-2017 school year.

III.    **The 2017-2018 IEP and School Year.**

18.     On May 31, 2017, an IEP team meeting was held to review and revise the Student's IEP and develop his IEP for the 2017-2018 school year. Parent participated in the IEP meeting.

19.     The May 2017 IEP for Student contained six annual goals for Student in the areas of advocacy, attending behavior, academic goals-work completion, writing, and two speech/language goals. The May 2017 IEP called for the District to provide reports about the Student's progress toward meeting the annual goals to Parent on a quarterly basis.

20.     The May 2017 IEP provided that Student would receive the following special education services: (1) "Special Education Staff supported study hall to check academic status (Skyward) and to provide support in work completion, writing tasks, and time management;" and (2) "Assignment notebook check near the end of the day with a Special Education Staff member." The IEP also provided for related services of 20 minutes of speech and language therapy once per week.

21.     The May 2017 IEP also provided for several supplementary aids and services including extended time on all writing assignments, differentiated summative and benchmark assessments to reduce the amount and length of writing in social studies and science, paragraph

6

outlines, assigned seat near a teacher, copies of classroom notes, access to word processing technology, and speech to text and word prediction software.

22.     In November 2017, the Parent requested an IEP team meeting based on concerns that the Student was not getting certain assignments done and had received poor grades on some assignments. An IEP team meeting was held in November 2017. No revisions were made to Student's IEP at that time.

23.     Throughout the 2017-2018 school year, Parent repeatedly requested that the District test Student's writing level to determine grade-level proficiency.  There was no requirement in the IEP or applicable regulations that mandated that the District test Student's writing to determine grade-level proficiency.  Student's writing was assessed in April of 2018, and Student was determined to be writing independently at the third to fourth grade level with respect to the particular assessment used, although Student had previously shown grade-level proficiency in other areas associated with the overall functions associated with writing.

24.     The Student received the following grades during the first semester of the 2017-2018 school year: C in American Literature and Composition; B in Mechanical Design 1; A in Concepts In Algebra/Geometry; A- in Geology and Earth Systems; C+ in U.S. History.

25.     The Student received the following grades during the second semester of the 2017-2018 school year: C- in American Literature and Composition; A in Mechanical Design 2; A- in Concepts In Algebra/Geometry; B in Team Sports; D+ in Space Sciences; and C- in U.S. History.

26.     The teachers in Student's American Literature and Composition class assessed students in five areas—speaking, writing, creation, analysis, and comprehension. With respect to Student, the teachers ultimately gave a "no count" score to Student with respect to Student's

7

writing, which neither helped nor hurt Student's grade in that class. The teachers did so in order to provide what they believed would be the most accurate reflection of his learning profile. One of the Student's teachers in that class testified that Student's final grade was an accurate description of Student's ability as a learner and what he was able to demonstrate throughout the school year. The Student was graded using the same grading rubric as other students in that class.

27. At the end of the Student's sophomore year, Student had achieved a 2.768 cumulative GPA and ranked in the top 75% of his class. Student was on track with respect to the credits needed for graduation with his class.

28. Of the six goals established for Student in the 2017-2018 IEP, Student met three of the goals. Student met the goals relating to academics and the two speech/language goals.

29. Student did not meet the goals in the 2017-2018 IEP related to advocacy, attending, and writing. However, one of Student's teachers, who was also Student's case manager, believed Student was making progress with respect to writing and that when Student used the supports provided to him was able to write in a manner similar to his peers.

30. Student's ACT Aspire scores in English, Reading, Science, and Math all increased from the Spring of 2017 to the Spring of 2018 and indicate that as of Spring 2018 Student was college and career ready in English, Science and Math and "close" in Reading.

IV. **The May 23, 2018 IEP Team Meeting.**

31. On May 23, 2018, Student's IEP team convened the annual meeting to write Student's IEP for the 2018-2019 school year. Student's case manager had created a draft IEP in advance of the meeting, which was provided to Parent (the "May 2018 Draft IEP"). The May 2018 Draft IEP included six goals for Student that covered a broad range of concerns, including

advocacy, an attending goal, two writing goals, an active listening goal, and a general study skills goal.

32.     The May 2018 Draft IEP provided that the Student would receive the following special education services for 40 minutes once per day in a special education-supported study hall: "direct instruction in writing skills; direct instruction to increase time management skills, work completion rate, improve understanding of academic status, and improve self-advocacy."

33.     The May 2018 Draft IEP also provided for 20 minutes per week of speech and language services. The District's speech language pathologist believed one 20-minute session was sufficient based on what Student had been able to accomplish the year before.

34.     The May 2018 Draft IEP also provided for a number of supplementary aids and services for Student.

35.     The IEP team did not finish developing the IEP for the 2018-2019 school year at the May 23, 2018 meeting, but instead agreed to reconvene at a later date to finish the IEP.

36.     On May 30 and May 31, 2018, the District sent emails to Parent informing her that the May 2018 Draft IEP would serve as a placeholder IEP until the IEP team reconvened to continue its review of the IEP.

**V.     The District Provides Extended School Year Services to Student.**

37.     During the IEP meeting on May 23, 2018, the IEP team discussed providing Student with extended school year ("ESY") services but did not make a final decision on those services. The Parent subsequently signed Student up for instruction over the summer at Lindamood-Bell, a private education center.

38.     The District agreed to pay for the cost for Student to receive five weeks of reading and writing instruction at Lindamood-Bell. This included the cost for Student to receive three to

four hours of instruction per day for five days per week, including transportation. Because the IEP team had not considered the Lindamood-Bell programming during the May 23, 2018, IEP meeting, the ESY services at Lindamood-Bell are not reflected in the May 2018 Draft IEP.

39. Progress updates that the District periodically received from Lindamood-Bell showed that Student was making progress in several areas of the programming during the Summer of 2018.

## VI.    Unilateral Placement of Student at Brehm.

40. On August 17, 2018, Parent provided the District with notice that she intended to enroll Student at Brehm Preparatory School ("Brehm") in Carbondale, Illinois, and that she would be seeking reimbursement from the District. Student began attending Brehm on August 27, 2018.

41. Upon enrollment of Student at Brehm, Brehm never sought to obtain any of Student's records from the District.

42. Student's curriculum at Brehm does not include instruction in science, social studies, or history.

43. After approximately six months at Brehm, Student's writing was estimated to be approximately fourth grade level for completely independent writing.

## VII.   Parent's Lack of Cooperation.

44. In June 2018, the District contacted Parent attempting to schedule a new time to reconvene to finish the IEP for the 2018-2019 school year. In response, Parent suggested, and the District agreed, that the IEP team should reconvene after the Student had completed the Lindamood-Bell programming so that the IEP team could consider Student's evaluation from the program.

10

45.     Following the completion of the Lindamood-Bell programming, the District e-mailed Parent multiple times attempting to set up a time to reconvene the IEP team meeting. Parent never provided the District with dates she would be available for an IEP meeting prior to Parent's unilateral withdrawal of Student from the District on August 17, 2018.

46.     Even after the District received Parent's notice on August 17, the District again attempted to connect with Parent to reconvene the IEP team and proposed a date for the IEP meeting of September 7, 2018.  However, on August 30, 2018, the District received notice from Brehm that Student was enrolled at Brehm.

47.     Despite agreeing that the IEP team should reconvene after the Lindamood-Bell programming was complete, Parent never met with the District to finalize Student's IEP prior to her decision to withdraw Student from the District.

48.     Parent also refused to allow District personnel to observe Student at Lindamood-Bell in order to gather information as to how the District could implement programming for the 2018-2019 school year.

49.     There were a number of services, programming, and supports that the District was prepared to offer in a reconvened IEP meeting, including direct instruction in writing skills, a co-taught English class, a supported study hall, and services recommended by Lindamood-Bell.

50.     In addition to Parent's failure to cooperate with District in the finalization of an IEP for the 2018-2019 school year, Parent also spent much of the summer of 2018 making the allegation that one of the District's employees was doing Student's writing for him and that this conduct was illegal forgery and/or fraud. The District investigated this allegation and determined that the employee had been using common educational techniques and tools with the Student, such as scaffolding, prompts, providing sentence stems, and grammar.

11

51.     Notwithstanding the results of the District's investigation, Parent repeatedly accused the District employee of fraudulently altering Student's work and engaging in criminal activity, even going so far as to file formal complaints with law enforcement agencies.

## VIII.   Procedural History.

52.     On January 25, 2019, Parent and Student, through counsel, requested a due process hearing under Wis. Stats. Chapter 115 and the IDEA. The due process hearing was held over five days in March and April of 2019.

53.     On July 1, 2019, the Administrative Law Judge ("ALJ") issued a Decision and Order in which the ALJ made the following three conclusions: (1) "[t]he District failed to provide the Student with a free, appropriate public education during the 2017-2018 school year;" (2) "[t]he  District failed to offer an individualized education program (IEP) for the 2018-2019 school year that would have provided the Student a free, appropriate public education and was reasonably calculated to enable the Student to make progress appropriate in light of the Student's unique circumstances"; and (3) "[t]he District is obligated to pay for the cost of the Student attending the Brehm Preparatory School, where he was unilaterally placed by the Parent in August 2018."

54.     The District subsequently requested clarification and on July 18, 2019, the ALJ issued an Amended Decision and Order which repeated the conclusions from the ALJ's July 1 Decision and Order but clarified that the District was ordered to "pay for the cost of the Student attending the Brehm Preparatory School during the 2018-2019 and 2019-2020 school years, namely the cost of the Student's tuition and transportation to and from the school at the beginning and end of the school year(s) and for holidays or other breaks when the school is closed."

12

## GROUNDS FOR REVERSAL OF THE ALJ'S DECISION AND ORDER

This action is an appeal of an ALJ's decision made in a due process hearing held under the IDEA and Wis. Stat. Chapter 115.The District appeals the ALJ's Decision and Order on the following primary grounds:

I.     **The ALJ Improperly Determined the District Failed to Provide Student with a Free Appropriate Public Education ("FAPE") During the 2017-2018 School Year**.

55.     The preponderance of the evidence in the administrative record demonstrates that the District provided Student with a free appropriate public education ("FAPE") during the 2017-2018 school year. The Student's 2017-2018 IEP was reasonably calculated to enable Student to receive educational benefits, which in the Student's case meant an IEP reasonably calculated to enable Student to achieve passing marks and advance from grade to grade. *Endrew F. v. Douglas Co. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017); *see also Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 615 (7th Cir. 2004) ("Objective factors, such as regular advancement from grade to grade, and achievement of passing grades, usually show satisfactory progress."). The school district "is not required to provide the best possible education." *Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 905 (7th Cir. 2002).

56.     The ALJ committed several errors of law and fact when concluding that the District failed to provide Student with a FAPE during the 2017-2018 school year.

57.     The ALJ failed to apply the correct legal standard or follow appropriate legal principles when concluding that the District failed to provide the Student with a FAPE during the 2017-2018 school year. The ALJ inappropriately used an alleged lack of actual progress to conclude that Student's IEP for the 2017-2018 school year failed to provide Student a FAPE under *Endrew F*. In doing so, the ALJ relied on the conclusion that Student only made *de minumus* progress in most of the areas where he required special education during the 2017-2018

13

school year. *Endrew F.* stands for the proposition that an IEP does not comply with the IDEA when it is reasonably calculated only to enable a child to make merely more than *de minimis* progress. The Supreme Court recognized, however, that the creation of an IEP is a prospective judgment by school officials and that the IDEA does not promise any particular educational outcome. *Endrew F.*, 137 S. Ct. 988 at 999. "[A]n IEP must be evaluated prospectively and not in hindsight." *M.B. ex rel. Burns v. Hamilton Se. Schs.*, 668 F.3d 851, 863 (7th Cir. 2011). The ALJ thus clearly erred by relying on evidence of Student's alleged lack of progress during the 2017-2018 school year when assessing whether Student had been provided a FAPE under *Endrew F.* It is well-established that whether an IEP provides a FAPE must be evaluated prospectively, and not in hindsight, and that the question is whether *at the time it was drafted* the IEP was reasonably calculated to enable the Student to make progress in light of the Student's circumstances. *Endrew F.*, 137 S. Ct. 988 at 999 ("To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. The 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program requires *a prospective judgment* by school officials." (emphasis added)).

58.     Even if Student's progress should be considered, the ALJ again failed to apply the correct legal standard or follow appropriate legal principles when the ALJ only evaluated Student's progress in the areas where Student required special education. The Student in this case was integrated in the regular classroom. For such a student, an IEP should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade. The school district should "provid[e] a level of instruction reasonably calculated to permit advancement through the general curriculum." *Endrew F.*, 137 S. Ct. at 1000. The Student here

14

achieved marks during the 2017-2018 school year—and during each school year the Student attended the District--sufficient to allow him to progress to the next grade. The ALJ also failed to consider or evaluate other objective evidence of Student's progress during the 2017-2018 school year, including increases in Student's ACT Aspire scores from Spring 2017 to Spring 2018, the fact that Student was indisputably on pace to graduate with his class, and the fact that Student met three of his six IEP goals for that year. The ALJ also failed to give appropriate weight to reports of progress by the District's educators.

59.     The ALJ also erred by comparing the 20 minutes per week of speech and language services provided to Student as a related service in the 2017-2018 IEP with testimony from Susan Carneol that a reading specialist or special education teacher providing 15 or 20 minutes per day, twice per week, of direct instruction in spelling and written expression would be "not at all" sufficient and that the "best practice would probably be a minimum [of] a half hour, 45 minutes, maybe even an hour, if not five days a week, [then] four days a week, or something equivalent." In doing so, the ALJ conflated different types of services that were provided to Student and two different recommendations by Carneol. The testimony from Carneol on which the ALJ relied related to the first recommendation in Carneol's April 2016 report—that the District "[c]ontinue with IEP under Other Health Impairment with direct intervention from the reading specialist or special education teacher on a program to improve spelling strategies and written expression." Carneol also included as a separate, second recommendation, that the District "[c]onsider adding speech and language as a related service in his IEP." The 20 minutes per week of speech and language services in Student's 2017-2018 IEP related to Carneol's *second* recommendation. The ALJ erred by comparing Carneol's testimony regarding what would be sufficient to implement her first recommendation with the services the District

15

provided to implement Carneol's second recommendation. The ALJ was, in effect, comparing apples and oranges. Indeed, in addition to the speech and language services, the 2017-2018 IEP also provided Student with 40 minutes per day of a special education staff-supported study hall to provide Student with support in writing tasks, among other things, which is well within the parameters of what Carenol testified would be best practices.

60.     The ALJ also erred by appearing to credit the Parent's subjective belief that Student needed more special education support in order to complete his writing assignments--over the testimony of the District's educators that the Student's IEP for 2017-2018 was sufficient to meet the Student's needs and provided FAPE--and appearing to fault the District for not revising the Student's IEP in November 2017 in response to Parent's concerns. Although an ALJ is "not required to accept supinely whatever school officials testify to," the ALJ "must give that testimony due weight." *Sch. Dist. of Wisconsin Dells v. Z.S. ex rel. Littlegeorge*, 295 F.3d 671, 676 (7th Cir. 2002). School districts are "entitled to deference in deciding what programming is appropriate as a matter of educational policy," *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 945 n.5 (9th Cir. 2010). Further, it is well-established that parents do not have the right to compel a school district to employ specific methodologies or supply specific programs for a child. *See Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988). Here, however, the ALJ appears to have faulted the District for not implementing the Parent's requests, based on the Parent's own subjective beliefs, without providing any explanation for why the additional special education support the Parent desired was necessary to provide Student a FAPE under the appropriate legal standards.

61.     The ALJ also erred by appearing to rely on additional irrelevant evidence of what occurred after Student's IEP was in place for the 2017-2018 school year. For example, the ALJ

relied on evidence that Parent made requests to have Student's writing evaluated in November 2017, February 2018, and March 2018, notwithstanding the lack of any legal or procedural requirement that such testing occur. The ALJ provided no explanation for why additional testing of Student was necessary to provide Student a FAPE and, regardless, Student was tested in April 2018.

62.     The ALJ further erred by relying on evidence that Student's teachers did not provide the Parent with quarterly, written progress reports required by the 2017-2018 IEP. Such evidence is irrelevant to the question of whether the 2017-2018 IEP satisfied the *Endrew F.* standard. Although a school district's failure to implement an IEP as written may, under some circumstances, deny a student FAPE, such failures are not automatically treated as violations of the IDEA but are instead reviewed for materiality. *See Van Duyn ex rel. Van Duyn v. Baker Sch. District 5J*, 502 F.3d 811, 820-822 (9th Cir. 2007). Moreover, a denial of FAPE based on a failure to implement an IEP according to its terms represents an argument distinct from the argument that an IEP was not reasonably calculated to provide a FAPE under *Endrew F.* Here, Parent and Student did not rely on the District's failure to provide written progress reports as the basis of their claim that the District did not provide Student a FAPE during the 2017-2018 school year, and the ALJ did not analyze the failure using the legal standards that would apply to such an argument. Instead, Parent and Student based their argument on a failure to meet the requirements of *Endrew F.*

## II.     The ALJ Improperly Determined the District Failed to Offer an IEP for the 2018-2019 School Year that Would Have Provided the Student a FAPE.

63.     The ALJ erred by analyzing whether the District failed to offer Student a FAPE for the 2018-2019 school year only through reference to the terms of the May 2018 Draft IEP. The ALJ erred by failing to consider as part of the analysis the five weeks of summer

17

programming for the Student at Lindamood-Bell, a private educational center, that the District provided to Student during the Summer of 2018. The ALJ also erred by failing to consider evidence of the Student's progress at Lindamood-Bell. The ALJ also erred by not considering services the District had been prepared to offer Student—including direct instruction in writing skills, a co-taught English class, a supported study hall, and services recommended by Lindamood-Bell—when Parent refused to cooperate in the finalization of an IEP.

64. The ALJ erred by assigning blame to the District, despite the Parent's ongoing lack of cooperation, for not completing an IEP for Student in August 2018 after Parent notified the District that she intended to unilaterally enroll Student at Brehm.

65. Even if it were appropriate for the ALJ to analyze only the terms of the May 2018 Draft IEP, the ALJ erred by determining the May 2018 Draft IEP was not reasonably calculated to enable the Student to make progress appropriate in light of the Student's circumstances.

66. As an initial matter, the ALJ's determination was likely tainted by the ALJ's errors with respect to the 2017-2018 IEP. The ALJ compared the services provided in the May 2018 Draft IEP to the services provided in the 2017-2018 IEP, which the ALJ had already wrongly concluded was inadequate. In doing so, the ALJ failed to acknowledge, consider or evaluate objective evidence of Student's progress during the 2017-2018 school year that was reflected in the May 2018 Draft IEP, Student's ACT Aspire scores, and the fact that Student was indisputably on pace to graduate with his class.

67. The ALJ also focused on the fact that Student had not met three of the six goals in his 2017-2018 IEP and those unmet goals were carried over, either through revisions or through similar goals, into the May 2018 Draft IEP. The ALJ failed to explain how carrying these goals over deprived Student of a FAPE. The ALJ appears to have wrongly concluded that because the

18

Student did not meet certain goals in the 2017-2018 IEP, that a new IEP that carried over those goals was necessarily deficient. This was error. *See James D. v. Bd. of Educ. of Aptakisic-Tripp Comm. Consolidated Sch. Dist. No. 102*, 642 F. Supp. 2d 804, 827 (N.D. Ill. 2009) (observing that "a student's failure to master IEP goals does not compel the conclusion that the IEP was not reasonably calculated to provide a FAPE, particularly where the student made progress towards achieving those goals" and that "the mere fact that a student's IEP goals are continued does not necessarily mean that the similar IEPs were not reasonably calculated to confer educational benefit").

68.     The preponderance of the evidence in the administrative record demonstrates that Student was making progress, despite certain goals in the 2017-2018 IEP not being met, and that the May 2018 Draft IEP was reasonably calculated to enable the Student to make progress in light of the Student's circumstances.

III.    **The ALJ Improperly Determined that the District Should Be Obligated to Pay the Cost of the Student Attending Brehm.**

69.     "Parents . . . who unilaterally change their child's placement without state or local school officials' consent are entitled to reimbursement only if a federal court concludes both that the public placement violated the IDEA and that the private school placement was proper under the Act." *Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 905 (7th Cir. 2002). In addition, equitable factors must weigh in favor of reimbursement and the cost of the reimbursement may be reduced or denied if the parents acted unreasonably. 20 U.S.C. § 1412(a)(10)(C)(iii).

70.     The ALJ erred by determining the District should pay for the cost of the Student attending Brehm because the ALJ erred by determining that the District failed to offer Student a FAPE for the 2017-2018 or 2018-2019 school year.

71. The ALJ erred by determining that Brehm was an appropriate placement for Student. As an initial matter, the ALJ does not appear to have engaged in reasoned decision-making, as the ALJ did not identify what standard, if any, the ALJ was applying to determine whether the placement at Brehm was appropriate or explain how the evidence on which the ALJ relied satisfied that standard. Instead, the ALJ conclusorily stated that "the educational plan and extensive, credible testimony of the Student's teachers at Brehm show that it is an appropriate placement for the student."[2] It is well-established that "an agency may not provide conclusory statements in place of genuine reasoning." *Hensley v. United States*, 292 F. Supp. 3d 399, 411 (D.D.C. 2018).

72. The ALJ erred in concluding that Brehm was an appropriate placement because the ALJ did not identify any objective evidence supporting her decision, but instead primarily relied on subjective testimony of the Student and Student's teachers at Brehm regarding Student's progress. Evidence of progress at a private school must be demonstrated by objective evidence and even such evidence does not itself establish that the private placement was appropriate. *See, e.g.*, *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836 (2d Cir. 2014); *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 522 (6th Cir. 2003).

73. The ALJ erred in concluding that Brehm was an appropriate placement because the ALJ failed to consider, address, or weigh contradictory evidence indicating that Brehm was not an appropriate placement for Student, including Brehm's failure to obtain Student's prior academic records, failure to provide Student instruction in core subjects such as science, social studies, and history, and the highly restrictive nature of Brehm. *Cf. Rafferty v. Cranston Pub.*

---

[2] The ALJ found the testimony "credible" even though such witnesses were not personally sworn on oath and appeared at the hearing by telephone, over the District's objection.

*Sch. Comm.*, 315 F.3d 21 (1st Cir. 2002). The ALJ also failed to even address the fact that Student's writing did not improve while at Brehm.

74.     The ALJ also erred by rejecting the District's argument that the Parent was not entitled to reimbursement because the Parent acted unreasonably. First, the ALJ concluded that "the Parent cannot reasonably be blamed for the District's failure to schedule and hold an IEP team meeting in August 2018." This conclusion was based on the ALJ's separate conclusion that the District should have held an IEP meeting in August 2018 without Parent in attendance. Whether the District should or should not have finalized an IEP in the absence of Parent's cooperation—i.e., whether the District had been unable to convince the Parent to attend—is not relevant to the question of whether the Parent acted unreasonably. Here, the Parent suggested and agreed to hold off on reconvening the IEP team until after the Student completed his instruction at Lindamood-Bell but then never cooperated in the IEP process after that date. The Parent refused to allow District employees to observe the Student at Lindamood-Bell to gain information about how the District could implement programming for the Student.  And the Parent repeatedly refused to provide dates when she would be available to reconvene the IEP team meeting, despite repeated requests from the District for her to do so. Instead, the Parent unilaterally placed the Student at Brehm without ever cooperating in the finalization of the IEP, which Parent herself had agreed should wait until after the Lindamood-Bell program was complete.  The ALJ's conclusion that Parent did not act unreasonably under these circumstances—and thus was entitled to reimbursement for the placement at Brehm—was an error of law and fact.  *C.G. and B.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279 (1st Cir. 2008) (wherein the Court held that the parents acted unreasonably by not participating in the IEP development process and thus, the Court denied the tuition reimbursement award).

Case 2:19-cv-01179-LA   Filed 08/15/19   Page 21 of 24   Document 1

75.     The ALJ also failed to give proper weight to evidence that Parent acted unreasonably by making meritless accusations that a District employee had fraudulently altered Student's work and engaged in criminal activity, including going so far as to file formal complaints with law enforcement agencies against the District employee.

## FIRST CAUSE OF ACTION
## Relief Under the IDEA (20 U.S.C. § 1415(i)(2); Wis. Stat. § 115.80)

76.     The District repeats and realleges each allegation contained in Paragraphs 1-75 as if fully set forth herein.

77.     The IDEA and Wisconsin law provide any party aggrieved by the findings and decision made in a due process hearing the right to bring a civil action a U.S. district court. 20 U.S.C. § 1415(i)(2)(A); Wis. Stat. § 115.80. In such an action, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *see also* Wis. Stat. § 115.80. The Court must "make an independent decision based on the preponderance of the evidence," while also giving "'due weight' to the determinations made during the state administrative process." *Bd. of Educ. of Tp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 270 (7th Cir. 2007).

78.     The District has been harmed by the ALJ's Decision and Order, which contains legal errors, was not sufficiently reasoned, is not supported by substantial evidence, and is clearly erroneous.

79.     The preponderance of the evidence in the administrative record demonstrates that, contrary to the ALJ's Decision and Order, the District provided Student with a FAPE during the 2017-2018 school year.

22

80.     The preponderance of the evidence in the administrative record demonstrates that, contrary to the ALJ's Decision and Order, the District offered Student a FAPE for the 2018-2019 school year.

81.     The preponderance of the evidence in the administrative record demonstrates that, contrary to the ALJ's Decision and Order, Brehm was not an appropriate placement for Student.

82.     The preponderance of the evidence in the administrative record demonstrates that, contrary to the ALJ's Decision and Order, reimbursement to the Parent for the expenses of the unilateral placement of Student at Brehm should be denied because the District provided the Student a FAPE for the 2017-2018 school year, offered Student a FAPE for the 2018-2019 school year, and Brehm is not an appropriate placement for Student. 20 U.S.C. § 1412(a)(10)(C).

83.     The preponderance of the evidence in the administrative record demonstrates that, contrary to the ALJ's Decision and Order, the Parent acted unreasonably and thus reimbursement to Parent for the expenses of Student's placement at Brehm should be denied. 20 U.S.C. § 1412(a)(10)(C)(iii).

84.     The District is entitled to reversal or vacatur of the ALJ's Decision and Order, and a declaration that Parent and Student are not entitled to any of the relief provided for in the ALJ's Decision and Order.

## PRAYER FOR RELIEF

WHEREFORE, the District respectfully requests that the Court enter judgment as follows:

A.  That the Court stay the ALJ's Decision and Order pending this Court's resolution of this appeal; and

B.  That the Court reverse or vacate the ALJ's Decision and Order, enter judgment in favor

of the District, and/or grant the District such other further relief as the Court determines is

appropriate under 20 U.S.C. § 1415(i)(2)(C) and Wis. Stat. § 115.80.

Dated:          August 15, 2019
                Milwaukee, Wisconsin


By:     s/Andrew T. Phillips_____

Andrew T. Phillips
Christine V. Hamiel
Matthew J. Thome
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
Phillips Phone: (414) 287-1570
Phillips Facsimile: (414) 238-6439
Hamiel Phone: (414) 287-1266
Hamiel Facsimile: (414) 238-6527
Thome Phone: (414) 287-1433
Thome Facsimile: (414) 238-6505
aphillips@vonbriesen.com
chamiel@vonbriesen.com
mthome@vonbriesen.com

*Attorneys for Plaintiff Grafton School District*