# EXHIBIT 1



**Before the**
**State of Wisconsin**
# DIVISION OF HEARINGS AND APPEALS

In the Matter of J█ L█

**AMENDED DECISION**

v.

DHA Case No. DPI-19-0003
DPI Case No. LEA-19-0003

Grafton School District

The Parties to this proceeding are:

, by

> Attorney Jeffrey Spitzer-Resnick
> Systems Change Consulting, LLC
> 430 Sidney Street
> Madison, WI 53703

Grafton School District, by

> Attorneys Christine V. Hamiel
>  and Andrew T. Phillips
> von Briesen & Roper, S.C.
> 411 E. Wisconsin Ave., Suite 1000
> Milwaukee, WI 53202

## PROCEDURAL HISTORY

On January 25, 2019, the Department of Public Instruction (DPI) received a request for a due process hearing under Wis. Stats. Chapter 115 and the federal Individuals with Disabilities Education Act (IDEA) from Attorney Jeffrey Spitzer-Resnick, on behalf of J█ L█ (the "Student") and L█ L█ (the "Parent"), against the Grafton School District (the "District"). DPI referred the matter to this Division for hearing.

The due process hearing was held on March 25, 26, and 27, 2019 and continued on April 29 and 30, 2019. The Decision was issued on July 1, 2019. On July 17, 2019, the District requested clarification regarding the Decision's Order, and the Order was amended on July 18, 2019.

## ISSUES

1. Did the District fail to provide the Student with a free, appropriate public education during the 2017-2018 school year?

2. Did the District fail to offer an individualized education program (IEP) for the 2018-2019 school year that would have provided the Student a free, appropriate public education and was reasonably calculated to enable the Student to make progress appropriate in light of the Student's unique circumstances?

3. Is the District obligated to pay for the cost of the Student attending the Brehm Preparatory School, where he was unilaterally placed by the Parent in August 2018?

## FINDINGS OF FACT

1. The Student and Parent are residents of the Northern Ozaukee School District. He began attending school as a kindergartner in that district. In 2009, when the Student was 7 years old and in second grade, he was referred by that district's school psychologist for a private neuropsychological evaluation. (Ex. 46)

2. In November 2009, Donna Laughrin, Ph.D., a clinical neuropsychologist, evaluated the Student. She administered several assessments, including the Wechsler Intelligence Scale for Children-Fourth Edition, on which the Student achieved an overall (full scale) IQ score of 117, 87th percentile, which is in the high average range. Dr. Laughrin prepared a written report in which she confirmed the Student's diagnosis of attention deficit/hyperactivity disorder, combined type, for which he had previously been prescribed medication. She recommended that the Student continue to receive treatment for his symptoms related to attention deficit/hyperactivity disorder and also recommended "continued monitoring of his academic skill development … particularly in the area of written expression, since there was evidence to suggest that language-based tasks do not come as naturally for him [as] visual-spatial tasks." *Id.*

3. When the Student was in fourth grade, he was medically diagnosed with an anxiety disorder. (Ex. 5, p. 1)

4. During the 2011-2012 school year, when the Student was in fourth grade, he began attending school in the Grafton School District, under Wisconsin's open enrollment program. (Tr. 562) At that time, the Student received accommodations under a 504 plan because the Northern Ozaukee School District had previously identified him as a student with a disability under § 504 of the federal Rehabilitation Act. (Tr. 943)

5. The Student (d.o.b. ████02) is currently 16 years old. He attended school in the District from fourth grade through 10th grade. (Tr. 562)

2

6. In June 2014, when the Student was in sixth grade, the District conducted a special education evaluation of the Student. The IEP team relied on existing data for the evaluation, such as the Student's 2009 neuropsychological evaluation and medical records, Student work samples and grades, and teacher observations of the Student. The IEP team did not conduct additional assessments of the Student. (Tr. 944) The IEP team determined that the Student met the eligibility criteria for other health impairment (OHI) disability and was in need of special education and related services, noting that the Student was medically diagnosed with attention deficit disorder (ADD) and anxiety. (Ex. 69)

7. According to the OHI eligibility checklist contained in the evaluation report, the IEP team determined that the Student's health problem was chronic, in that he had "struggled with attention, focus, organization and written output since at least second grade," and was acute, in that his work completion "[e]ven with graphic organizers and individual attention from his teacher" was "significantly delayed relative to his peers." Further, the IEP team found that the Student's health problem resulted in limited vitality and limited alertness. The IEP team concluded that the Student's educational performance was adversely affected in the areas of academic achievement, behavior, and classroom performance, as evidenced by the following:

> [The Student] is currently provided with modifications to address his classroom performance (shortened/prioritized assignments, scaffolding for all written work, combining subject areas to reduce need for written output, etc.). Despite these strategies, [the Student] continues to struggle with the demands of the classroom. This has a significant negative impact on his academic achievement, particularly in communication arts/literacy. *Id.*

8. Upon completion of the Student's special education evaluation, the IEP team developed an IEP on June 2, 2014 that would be in effect for the Student during seventh grade. In considering the Student's current level of academic achievement at that time, the IEP team stated that he performed at or above grade level in math, understood the content in science and social studies classes, performed below grade level in communication arts/literacy, and was significantly delayed in written expression. In terms of functional performance, the IEP team noted the following in the IEP: the Student's work production was highly inconsistent; that his mood was quick to change, such as refusing to work, crying, and collapsing on the floor; he demonstrated "silly" or unexpected behaviors, such as sitting under the table; he was disorganized; he was quick to anger or cry when things did not go as he expected; and he struggled to make simple decisions. The IEP team stated that the Student's OHI disability impacted his ability to keep up with the pace and scope of the regular education curriculum, that his inability to focus caused him to miss instruction in class, his lack of organization interfered with his work completion in and outside of the classroom, and that written tasks presented a significant challenge for the Student across subject areas. *Id.*

9. The June 2014 IEP contained one annual goal related to the Student increasing his organizational skills. The IEP stated that the special education services to be provided to the Student would be "academic support" in the special education classroom for one class period per day, and it also included some supplementary aids and services, such as extended time for writing assignments, incentives to increase work completion, use of a computer program to assist in written assignments, and afternoon check-outs to monitor assignment notebook completion. *Id.*

10. In January 2015, when the Student was in seventh grade, the Parent had a consultation of the Student conducted at Handwriting Problem Solutions, LLC, in Olivet, Michigan. The two consultants determined that the Student showed symptoms of dysgraphia, which is a neurological disorder of written expression, as defined in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV). They prepared a written report regarding the consultation that included several recommendations for helping the Student improve his writing. The Parent shared the consultation report with District staff. (Ex. 57)

11. In April 2015, when the Student was 12 years old, his primary doctor referred him for a neuropsychological evaluation. Frank Gallo, PHD, Ph.D., a clinical neuropsychologist with a subspecialty in pediatric neuropsychology, evaluated the Student. On the Wechsler Abbreviated Scale of Intelligence-II, the Student received an overall IQ score of 111, 77th percentile, in the high average range. In summarizing his findings, Dr. Gallo stated that the Student's cognitive and motor testing showed average to above-average functioning but that academic screening revealed a significant weakness in spelling skills, at a mid-third grade equivalency level. Dr. Gallo further stated that the Student displayed signs of dysgraphia, the disorder of written expression, and said the diagnosis was "probable" and could not be fully confirmed because the Student refused to comply with testing and was emotionally reactive. Specifically, Dr. Gallo noted that the Student became frustrated during a sustained attention test and began to cry, pounded on the keyboard, screamed that he hated it, and refused to continue the task. Dr. Gallo stated that the Student was overly concerned with his performance and occasionally showed signs of inattention. According to Dr. Gallo's report, psychological factors commonly contribute to, or are interrelated with, learning problems in children and, for the Student, his emotional reactivity, lack of self-confidence, poor motivation, low frustration tolerance, and excessively high performance expectations, "surely play some role in his writing difficulties." Dr. Gallo made various recommendations regarding the Student continuing to receive special education services in school related to his organizational, attention, writing, and expression difficulties and also recommended that the Parent and care providers consider anxiety treatment, social skills training, and specialized tutoring in spelling, written expression, and organizational skills for the Student outside of school. (Ex. 47)

12. The Parent followed up on Dr. Gallo's recommendation by having the Student receive therapy services at University of Wisconsin-Milwaukee's Anxiety Clinic, and the Student also received services from private therapist Dr. Jean Monty regarding his anxiety and organizational challenges. (Ex. 5, p. 3; Ex. 82, p. 4)

13. On May 19, 2015, the District held an IEP team meeting to develop the Student's IEP that would be in effect during eighth grade, the 2015-2016 school year. Similar to his first IEP from the prior school year, the Student's IEP contained one annual goal related the Student increasing his organizational skills. The IEP required that the Student receive only 10 minutes per week of special education services, described as: "Targeted skill work in written language with grammar, structure and content." These special education services were to be provided in the general education classroom. The IEP also included supplementary aids and services and program supports, including, but not limited to, the following:

   - special education support in communication arts and literacy classes to monitor on-task behavior and assist with written work;
   - when his writing is not being measured, a scribe will be offered if he is required to write more than one paragraph; and
   - use of a speech-to-text program to assist with writing assignments. (Ex. 71)

14. In February 2016, during the second semester of eighth grade, the Parent was informed by the Student's English/language arts teacher that the Student had not been receiving special education support in class as required by his IEP. (Tr. 564-565, 1009) The District's school psychologist Julie Lori sent an email to the Parent on February 4, 2016 apologizing on behalf of the District that the Student had not received support in the class during first semester and assuring the Parent that the required support would be provided to the Student in language arts class for the remainder of second semester. (Ex. 58)

15. In April 2016, at the request of the Parent, the District reevaluated the Student to determine if he met the eligibility criteria for a speech/language impairment or speech/language as a related service. The IEP team relied upon an independent evaluator to conduct the speech and language evaluation of the Student and concluded that no additional assessments were necessary to determine if the Student continued to meet the OHI eligibility criteria. (Ex. 6)

16. Susan Carneol, a certified and licensed speech and language pathologist with over 40 years of experience, conducted a speech and language evaluation of the Student on April 14 and 18, 2016. (Tr. 112-114) Ms. Carneol conducted several assessments of the Student but was unable to complete the formal assessment of his overall written expression because the Student became visibly agitated and oppositional when asked to write or dictate even one sentence. In her written report, she stated that:

   It is difficult to say if the [Student's] phonological processing deficit causes his anxiety with regards to written and verbal expression or vice versa. It is best to consider that both interact with each other. All that said, his noticeable weakness with phonological memory and clinical observations of word retrieval difficulties are characteristic of Dyslexia.

5

(Ex. 5)

Ms. Carneol recommended that, based on his other health impairment (OHI), the Student should continue to receive special education services, including "direct intervention from the reading specialist or special education teacher on a program to improve spelling strategies and written expression." She also recommended that the IEP team consider adding speech and language as a related service in the Student's IEP. Ms. Carneol noted that, while the Student would not meet the state's eligibility criteria for a speech and language impairment, because of his "underlying language processing impairment (phonological processing), retrieval and formulation difficulties affecting [his] oral and written expression, and social pragmatic weaknesses, [the Student] would benefit from the support of an experienced speech-language pathologist." In addition, Ms. Carneol recommended that the Student would benefit from direct training by a speech-language pathologist or special education teacher in the use of graphic organizers as a way to organize verbal information for both comprehension as well as oral and written expression. Finally, she recommended close communication and collaboration between all support professionals and the Parent be maintained to help the Student succeed. *Id.*

17. Ms. Carneol referred the Student for a neuropsychological evaluation, which was conducted by Robert Newby, Ph.D., a licensed psychologist and pediatric neuropsychologist, on April 21 and May 19, 2016. Dr. Newby performed several assessments of the Student, including the Wechsler Intelligence Scale for Children-Fifth Edition, on which the Student achieved an overall (full scale) IQ score of 124. In his written report, Dr. Newby stated that the Student's ADHD and anxiety continued to impact the Student's functioning, "primarily via chronic avoidance of writing tasks, despite his benefit from medication and psychotherapy." Dr. Newby noted that his findings and conclusions were essentially consistent with previous assessments of the Student, "except that [the Student's] writing skill has not progressed at age-expected rate since his first neuropsychological evaluation at age 7 years." Dr. Newby summarized his evaluation findings, as follows:

> [The Student] shows superior range intelligence, with particular strengths in fluid reasoning and visual-spatial problem-solving. He is solidly average in verbal reasoning, as well as verbal working memory and in-clinic attention testing [while] on medication. In contrast with his high average to above average skills in the specific processing areas of long term verbal memory, manual dexterity, visual-motor coordination, math problem-solving, and executive functioning (planning, organization), he is below average in processing speed and written sentence composition, with well below average spelling and qualitatively erratic mechanical writing precision. This profile means that his present level of performance in written expression is overall at the level of specific learning disability, though it is acknowledged that his response to intensive, scientific/research based instruction at school would need to be monitored for a period of time to

determine if he meets formal Wisconsin public school criteria for this additional special education category. (Ex. 7)

18. On June 2, 2016, an IEP team meeting was held for the Student's reevaluation and to develop an IEP for the 2016-2017 school year when the Student would be a freshman in high school. The IEP team determined that the Student continued to meet the criteria for OHI "related to [his] ADHD, Anxiety, and delayed written expression skills." The IEP team determined that the Student did not meet the criteria for a speech/language impairment. (Ex. 82)

19. The June 2016 IEP required that the Student receive the following special education services: 1) targeted skill work in written language with grammar, structure and content in Read to Succeed, to be provided for one class period per day in the special education classroom; 2) supervised study, to be provided for one class period per day in the special education classroom; and 3) assignment notebook accuracy check at the end of each school day. The IEP also stated that the Student would receive the related service of 20 minutes of speech and language twice per week in the speech room. The IEP also included several supplementary aids and services and program support. (Ex. 6)

20. The June 2016 IEP included four annual goals. The four goals were as follows:

**Goal 1:**
Organization. [The Student] will improve his organizational skills as evidenced by his achieving the following benchmarks:
- Demonstrate the ability to record daily assignments in a way that works for him (take snapshots of all daily homework assignments, use voice memo, etc.) with 90% accuracy.
- Demonstrate the ability to organize and manage his time to complete assignments by the given due dates with 85% accuracy.
- Demonstrate the ability to have papers in assigned folders/areas in 4 out of 5 check-ins.

**Goal 2:**
English 9. [The Student] will independently write a paragraph that meets the requirements for Developing on the Grafton High School Writing Rubric for 9/10 grade in the following categories:
- Critical thinking and content
- Organization
- Language
- Conventions and Usage

7

**Goal 3:**

Academic Goals. [The Student] will improve his academic skills as evidenced by his achieving the following benchmarks:

- When given a task or direction, [the Student] will demonstrate the ability to begin the task within one minute and remain on the task for a minimum of 10 minutes independently, with no more than 2 prompts/reminders to stay on task, in 8 out of 10 opportunities.
- Demonstrate the ability to attend (sit still, eyes on teacher, hand to self, quiet voice) to a task during large and small group instruction across settings for a 10 minute period with no more then *(sic)* 1 teacher prompt in 4 out of 5 trials.[1]

**Goal 4:**

Speech-Language. [The Student] will effectively and efficiently retrieve, organize, and formulate verbal and/or written expression of his thoughts, ideas, knowledge, and feelings within the classroom setting and out in social situations with peers and adults by achieving the benchmarks listed below:

- [The Student] will produce a 5 sentence paragraph after completing the pre-writing strategies listed below in a 20 minute time period:
  1. List at least 5 words/thoughts associate with given topic and place words/thoughts in graphic organizer of choice.
  2. Provide a complete sentence for each word or thought.
  3. Sequence or organize sentences in a relevant order.
  4. Combine sentences in relevant order to produce 5 sentence paragraph.
- [The Student] will be able to explain and demonstrate each of the active listening strategies with 100% accuracy while participating in a 3-5 minute conversation including the following:
  1. Appropriate eye contact, body posture, and facial expressions
  2. Asking appropriate questions
  3. Paraphrasing or repeating what the speaker has said
- [The Student] will demonstrate strategies to facilitate auditory working memory by demonstrating recall of 80% of information using:
  1. Rehearsal
  2. Chunking
  3. Relational strategies
  4. Visualization
- [The Student] will demonstrate 2-3 self-cueing strategies (extra thinking time, use of associated word, sound cue, pantomime/gesture, etc.) to facilitate word retrieval during verbal

---

[1] A third benchmark was included for Goal 3, but it was the same as the second benchmark and, therefore, appeared to be an error or oversight and will not be restated here.

> discourse with adult during at least a 3 minute conversational exchange.
> *Id.*

21. During the summer of 2016, as compensatory education for the Student not having received special education support in English/language arts class during the first semester of the 2015-2016 school year as required by his IEP, the District hired a private tutor to work with the Student on his language and writing skills. The tutor was Lisa Chase, a certified academic language practitioner, who was retired and had worked as a special education teacher for 37 years in Los Angeles, California, and at Milwaukee and Maple Dale-Indian Hills public school districts in Wisconsin. Ms. Chase worked with the Student from the end of June to August 2016 and believed that he needed more assistance with written expression and homework in school once the school year started. (Tr. 63-65) Ms. Chase recommended to the Parent that the Student have a study hall each school day with a District teacher/staff person who was trained in working with students who had ADHD and problems with written expression, so the teacher would understand the way the Student learned and could help him complete homework assignments each school day. (Tr. 65-67) The Parent emailed Susanne Lilly, who was the District's Director of Special Education and Student Services at that time, asking to have an IEP team meeting to revise the Student's IEP and class schedule in order to include Ms. Chase's recommendation in the Student's IEP. (Ex. 3) The Parent offered to pay for a dyslexia tutor to provide the study hall services recommended by Ms. Chase, but the District rejected that offer. (Tr. 1010, 1024-1025) The Student's IEP was not revised to include the services recommended by Ms. Chase. (Tr. 567-570)

22. By email dated May 15, 2017, the Parent asked the Student's case manager/special education teacher, Adam Heitzkey, and the Student's 9th grade Read to Succeed teacher to have the Student's writing evaluated. (Ex. 24, Tr. 574)

23. On May 31, 2017, an IEP team meeting was held to review and revise the Student's IEP and develop his IEP for the 2017-2018 school year, his sophomore year in high school. The IEP provided that the Student would receive the following special education services: 1) special education staff supported study hall to check academic status and to provide support in work completion, writing tasks, and time management for 40 minutes per day; and, 2) assignment notebook check near the end of the day with a special education staff member for five minutes per day. The IEP also included 20 minutes per week of speech and language as a related service, which was half the amount of speech and language services that had been included in his prior year's IEP for the 2016-2017 school year. (Ex. 70)

24. The May 2017 IEP contained six annual goals. The first goal was listed simply as "Advocacy." The baseline for this goal stated, "[The Student] does not exhibit the ability to independently seek out clarification on content and expectations or support for missing work." The level of attainment expected for this goal was described as, "[The Student]

9

will independently seek out the clarification of content and expectations or support for missing work in 5 out of 10 opportunities." *Id.*

25. The second goal in the May 2017 IEP was "Attending-behavior." The baseline stated, "When off-task behavior emerges and [the Student] requires redirection to the class activity or expected task, he is able to respond appropriately and comply with the request in 2 out of 5 instances." The level of attainment expected for this goal was that when off-task behavior emerges and the Student requires redirection to the class activity or expected task, he would be able to respond appropriately and comply with the request in 4 out of 5 instances. *Id.*

26. The third goal in the May 2017 IEP was entitled "Academic goals-work completion." The baseline stated, "[The Student] is able to independently complete assigned coursework and submit it by the due date 25% of the time." The level of attainment expected was an increase to 60% of the time. *Id.*

27. The fourth goal in the May 2017 IEP was "Writing." The baseline stated, "[The Student] is able to create a paragraph that meets the requirements for Beginning/Developing in the areas of Content, Critical Thinking and Argument and Conventions and Usage on the Grafton High School Writing Rubric-9/10." The level of attainment was that the Student would be able to independently, with teacher feedback on drafts, complete assigned coursework and submit it by the due date 25% of the time. The level of attainment expected was an increase to 60% of the time. *Id.*

28. The fifth goal in the May 2017 IEP stated that the Student "will list at least 5 words/thoughts associated with given topic and then produce a complete sentence for each word or thought and sequence sentences in a relevant order to produce a 5 sentence paragraph with 80% accuracy." The baseline was listed as 50% accuracy, and the level of attainment was 75% accuracy. *Id.* Presumably, the 80% accuracy stated in the goal itself was a mistake, since it was higher than the projected level of attainment.

29. The sixth goal in the May 2017 IEP was stated as follows: "[The Student] will independently demonstrate active listening strategies with 90% accuracy while participating in a 3-5 minutes *(sic)* conversation including the following: appropriate eye contact, body posture, and facial expressions; asking appropriate questions and making appropriate comments; maintaining topic; appropriate turn taking *(sic)* skills." The baseline was listed as 70% accuracy, and the level of attainment was 90% accuracy. *Id.*

30. The May 2017 IEP required that quarterly reports about the Student's progress toward meeting the annual goals be provided to the Parent. *Id.* The Student's case manager Mr. Heitzkey did not provide the required quarterly progress reports to the Parent during the 2017-2018 school year. (Ex. 78, Tr. 1114-1116)

31. The May 2017 IEP also provided that the Student would receive the following supplementary aids and services:

10

- Extended time on all writing assignments that are a paragraph or more (200%);
- Differentiated summative and benchmark assessments to reduce the amount and length of writing necessary for [the Student] to exhibit understanding of content in Social Studies and Science;
- Paragraph outlines provided for [the Student] so he can organize his thoughts prior to writing of paragraphs/essays in Communication Arts;
- Assigned seat near a teacher to allow for redirection and reinforce on-task behavior;
- Copies of classroom notes with at least 50% of the information included to reinforce on-task note-taking behavior;
- Access to word processing technology for writing assignments that are a paragraph or more and will be graded for spelling, grammar, and organizational accuracy; and,
- Speech to Text and Word Prediction software to support [the Student] in writing tasks.

*Id.*

32. In November 2017, the Parent asked the District to convene an IEP team meeting to review the Student's IEP, based upon her concerns that the Student was not getting his English writing assignments done and had received some D and F grades on assignments. (Ex. 28, Tr. 600-603, 1010-1011) An IEP team meeting was held, but no revisions were made to the Student's IEP. (Ex. 75, Tr. 1079, 1169-1171)

33. In an email dated November 14, 2017, to one of the high school administrators, the Parent asked the District to evaluate the Student's writing ability. (Ex. 28)

34. By email dated February 17, 2018, the Parent again asked Mr. Heitzkey if the District had evaluated the Student's writing level. (Ex. 29) On March 27, 2018, the Parent again emailed Mr. Heitzkey, asking to have the Student's writing ability level tested prior to May 1, 2018. (Ex. 30)

35. In April 2018, Elizabeth Mintie, the District's college and career instruction specialist, did an assessment of the Student's writing level, based upon a paragraph that he wrote in English class. (Ex. 13, Tr. 310-311) Assessing the Student's writing sample against normed exemplars, Ms. Mintie determined that the Student's paragraph was written at third to fourth grade level. (Tr. 316-318, 1187)

36. The Student received the following grades during the first semester of his sophomore year: C in American literature and composition; B in mechanical design 1; A in algebra/geometry; A- in geology and earth systems; and C+ in U.S. history. He received the following grades for the second semester: C- in American literature and composition;

11

A in mechanical design 2; A- in concepts in algebra/geometry; B in team sports; D+ in space sciences; and C- in U.S. history. (Ex. 76)

37. For American literature and composition class during the Student's sophomore year, there were five areas that were assessed/considered in determining the students' grades for the class – speaking, writing, creation, analysis, and comprehension. (Tr. 1234) The Student's co-teachers for that class, Helen Kunick and Mr. Heitzkey, did not consider or include the Student's writing in determining the Student's grade in the class. (Ex. 79, Tr. 1234-1235, 1243)

38. Mr. Heitzkey utilized Google Docs to assist the Student with his writing, especially in his sophomore American literature class. Google Docs allowed Mr. Heitzkey to assist the Student on writing assignments, for example, by creating scaffolding, entering sentence stems, adding information, and editing the Student's written work. (Tr. 1121-1125)

39. The Student did not utilize or fill out his assignment notebook during the 2017-2018 school year. (Ex. 10, Tr. 588-589, 1061-1064) Mr. Heitzkey often sent emails to the Parent regarding the Student's assignments and homework during the Student's sophomore year. (Tr. 590, 1062)

40. As of May 20, 2018, the District's online Skyward program, which allowed parents to check the status of their student's assignments, showed that the Student had 44 missing assignments for the 2017-2018 school year. (Tr. 621-622)

41. The Student was resistant to and did not utilize the Speech to Text technology that was offered to him as a supplementary service in his IEPs. (Ex. 70 and 72, Tr. 1075, 1078, 1132-1133)

42. On May 23, 2018, the District held an IEP team meeting for the annual review, revision, and development of the Student's IEP. Mr. Heitzkey provided a draft IEP to the Parent at the start of the meeting. (Ex. 36; Tr. 623-624, 1105)

43. The May 23, 2018 IEP contained two pages that reviewed the Student's progress towards the annual goals that were contained in his prior May 2017 IEP. The Student did not achieve three of the six goals contained in the May 2017 IEP, specifically goals 1, 2, and 4 that related to advocacy, attending, and writing, respectively. (Ex. 72, Tr. 1213-1214) The three goals that were recorded as having been met were goals 3, 5, and 6, related to academics, writing five words and thought about a given topic to produce a complete sentence, and independently demonstrating active listening strategies. The latter two goals, goals 5 and 6, related to the Student's work with the speech and language pathologist. (Ex. 72, Tr. 1214)

44. The IEP team did not finish developing the Student's IEP for the 2018-2019 school year at the May 23, 2018 IEP meeting. The IEP team did complete its review and drafting of the annual goals in the IEP, although they could have been further revised at a subsequent

IEP meeting. (Tr. 1000) At the end of the IEP meeting on May 23, 2018, the IEP team discussed reconvening the meeting, possibly in June 2018, to finalize the IEP. (Tr. 965)

45. After the IEP meeting on May 23, 2018, the Student showed the Parent how to see the editing history of his written assignments on Google Docs. Based upon what the Parent saw on Google Docs, she believed that Mr. Heitzkey had written or altered much of the Student's writing on some of his American literature assignments and/or exams and that this conduct constituted illegal forgery and/or fraud. (Ex. 12 and 34, Tr. 621, 629-633, 710) The Parent asked the District to investigate the situation, and she reported Mr. Heitzey's alleged conduct to the Grafton police department, the Ozaukee sheriff's department, and DPI. (Ex. 85, Tr. 710) The District investigated the Parent's allegations against Mr. Heitzkey and found them to be unsubstantiated, and the Grafton police department closed its case after determining the allegations constituted a civil law matter, rather than a criminal matter. (Ex. 68 and 93)

46. On May 30 and 31, 2018, Julie Lori, the District's school psychologist, emailed the Parent and informed her that, because the District was legally required to complete the Student's annual IEP review and revision by May 31, 2018, the IEP that was partially completed at the IEP meeting on May 23, 2018 would be in effect as a "place holder" until the IEP team reconvened to continue its review and revision of the IEP. (Ex. 73, Tr. 966-967)

47. The May 2018 IEP provided that the Student would receive the following special education services for 40 minutes once per day in a special education-supported study hall: direct instruction in writing skills and direct instruction to increase time management skills, work completion rate, improve understanding of academic status, and improve self-advocacy. The IEP also included 20 minutes per week of speech and language services in the speech room. The supplementary aids and services in the May 2018 IEP were primarily the same as those included in the Student's May 2017 IEP, except the use of an assignment notebook was removed. (Ex. 72)

48. The first goal in the May 2018 was entitled "Advocacy." The baseline for this goal stated, "When [the Student] encounters a need for clarification on expectations or direction on academic tasks, he will independently seek out the support of his classroom teacher by raising his hand, approaching the teacher, or requesting another time to meet." *Id.*

49. The second goal in the May 2018 IEP was entitled "Attending." The baseline stated, "When given a single prompt to engage or re-engage in an individual classroom activity or task [the Student] will be able to sustain attention to the activity or task for 15 minutes in non-preferred classes." *Id.*

50. The third goal in the May 2018 IEP was entitled "Writing." The baseline stated, "When given a pre-writing essay outline or graphic organizer, [the Student] will be able to independently compose an academic paragraph that includes a topic sentence, a claim, evidence, a warrant, and a conclusion sentence." *Id.*

51. The fourth goal in the May 2018 IEP stated that "[the Student] will independently list at least 5 words/thoughts/ideas associated with a personal choice topic and produce a complete sentence for each word/thought (5 sentences total) and sequence the sentence in a relevant order to produce a 5 sentence paragraph with 90% accuracy." The baseline was listed as 80% with significant support, and the level of attainment was set at 90% independently. *Id.*

52. The fifth goal in the May 2018 IEP stated that "[the Student] will independently demonstrate active listening strategies with 90% accuracy while participating in a 3-5 minute conversation/activity in a variety of environments (Speech Room, regular education classroom, study hall, etc.). Active listening strategies include the following:
    - appropriate eye contact, body posture, and facial express
    - asking appropriate questions and making appropriate comments
    - maintaining topic
    - appropriate turn taking skills"
The baseline was listed as 80-90% accuracy, and the level of attainment was 90% accuracy independently. *Id.*

53. The sixth goal in the May 2018 IEP was entitled "Study Skills." The baseline stated, "[the Student] will be able to independently determine what school work he needs to prioritize and complete by checking Skyward, Canvas, and communicating with his teachers to create a task list for study hall and at home." *Id.*

54. At the IEP meeting on May 23, 2018, the IEP team discussed providing services to the Student during the summer but did not reach a decision regarding summer services. (Tr. 648) In June 2018, the Parent signed the Student up to receive writing instruction at Lindamood-Bell, a private educational center, over the summer. She sent an email to the District confirming that the District would pay for the cost of those services. The District agreed to pay the cost of the Student receiving four weeks of educational services at Lindamood-Bell during the summer of 2018. (Ex. 85 and 86, Tr. 1436-1439) The educational services from Lindamood-Bell were not included in the Student's IEP. (Ex. 72)

55. The District did not contact the Parent to reconvene the IEP meeting in mid-June 2018, as had been tentatively discussed by the IEP team members. The Parent did not refuse to attend an IEP team meeting in June 2018. (Tr. 651, 705-706)

56. The District hired a new Director of Pupil Services, Laura Stautz, who began the job on July 1, 2018. (Tr. 1431) Ms. Stautz contacted the Parent by email about reconvening the IEP meeting to finalize the Student's IEP, and she and the Parent agreed that it would be beneficial to schedule the IEP meeting after the Student had completed his instruction at the Lindamood-Bell program in mid-August 2018 so the IEP team could consider his evaluation from that program and have a better idea of the Student's needs. (Ex. 85, Tr. 1434)

57. The District received information from Lindamood-Bell regarding its initial evaluation of the Student and progress reports regarding his work in the program. (Ex. 8, 87, and 88) The Student made progress in some, but not all areas, of instruction at Lindamood-Bell. In the area of word attack skills, the Student made two to three years' worth of growth. He also showed good progress in the area of auditory conceptualization and made some progress in oral reading and spelling. In the writing area of conceptual conventions, however, he remained at the 25th percentile, which is at about the fourth grade level. (Tr. 1444-1446)

58. On August 13 and 15, 2018, Ms. Stautz sent the Parent emails asking her to provide dates that she would be available to attend another IEP meeting to review and revise the Student's IEP. The Parent wrote back, expressing her frustration with the District failing to meet the Student's needs in the past and discussing her concerns about Mr. Heitzkey and the investigation into his conduct related to allegedly altering the Student's writing. The Parent did not provide dates that she would be available for an IEP meeting. (Ex. 89)

59. On August 17, 2019, the Parent sent District Superintendent Jeff Nelson an email notifying him that she intended to remove the Student from the public school district and place him at Brehm Preparatory School ("Brehm") in Carbondale, Illinois on September 4, 2018 or before and that she would be seeking reimbursement from the District for the cost of the Student attending the private school. (Ex. 42)

60. On August 17, 2018, Ms. Stautz sent the Parent an email in which she acknowledged that the District had received her email that day and asked if the Parent would be interested in a facilitated IEP meeting or engaging in mediation with the District. (Ex. 89)

61. On August 30, 2018, Ms. Stautz sent the Parent an email stating that the District considered the Student to still be enrolled in the District because the District had not received a records request from Brehm and because the Parent had not called the high school counseling office to "officially end his enrollment in the district." In the email, Ms. Stautz stated that the Parent had "declined three times" to reconvene the IEP meeting. Ms. Stautz informed the Parent that the District would hold an IEP meeting to review the Student's IEP on September 7, 2018 and would mail an official invitation to the IEP meeting to the Parent. (Ex. 90)

62. On August 30, 2018, the District received a letter from the Director of Admissions at Brehm stating that the Student was enrolled at the school for the 2018-2019 school year, which began on August 27, 2018. (Ex. 91)

63. During the 2018-2019 school year at Brehm, the Student has been receiving speech and language therapy services each day, for a total of 96 minutes per week, and also receives speech and language services from a second speech and language therapist in a small group and individually for 47 minutes twice per week. (Ex. 2, Tr. 172-173) In addition,

the Student has been receiving content support instruction on a daily basis, totaling 94 minutes per week, in a small group of about six students with a teacher who assists with homework assignments. (Tr. 173-174) The Student also has been receiving executive functioning and advisement services on a daily basis, totaling 100 minutes per week, to recap each day and work on problem-solving, organization, time management, self-empowerment, goal-setting, and self-awareness. (Tr. 174-175) His program at Brehm also includes structured study hall five times per week for nine hours total per week, technology instruction as needed one per week for 45 minutes, core class instruction (linguistic literacy, literary analysis, writing and communications, and algebra) for 940 minutes per week, personal fitness and wellness for 235 minutes per week, computer science class for 141 minutes per week and art/PACT (photography, art, and computer technology) for 470 minutes per week. (Ex. 2, Tr. 172-179)

64. On January 25, 2019, the Parent filed a request for a due process hearing, seeking reimbursement from the District for the cost of the Student attending school at Brehm.

65. The Parent prepared a document that showed the cost of yearly tuition at Brehm to be $78,850 per year and also showed the cost of flights for the Student to and from Brehm. (Ex. 44)

## DISCUSSION

### Burden of Proof

The U.S. Supreme Court has ruled that the burden of proof in an administrative hearing challenging an IEP is on the party seeking relief. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005). As the complainants in this matter, the burden of proof is on the Parent. The Parent must "cite credible evidence that the choice[s] the school district made cannot be justified." *Sch. Dist. v. Z.S.*, 184 F.Supp.2d 860, 884 (W.D. Wis. 2001), *aff'd* 295 F.3d 671 (7th Cir. 2002).

### Free, Appropriate Public Education during the 2017-2018 School Year

The IDEA requires that all children with disabilities are offered a free, appropriate public education (FAPE) that meets their individual needs. 20 USC § 1400 (d); 34 CFR § 300.1.

In *Endrew F. v. Douglas Co. Sch. Dist. RE-1*, 137 S.Ct. 988 (2017), the Court ruled that the IDEA requires a school district to offer an IEP that is reasonably calculated to enable a child to make progress appropriate in light of the child's unique circumstances. The Court noted that a child should have the chance to meet challenging objectives and rejected the 10th Circuit Court's interpretation of the IDEA that an IEP is appropriate if it allows a child with a disability to make "merely more than *de minimus*" progress. The Court also declined to adopt the parents' argument that FAPE is "an education that aims to provide a child with a disability opportunities to achieve academic success, attain self-sufficiency, and contribute to society that are substantially equal to the opportunities afforded children without disabilities."

In this case, the Parent alleged that the District denied the Student a FAPE during the 2017-2018 school year. Since at least sixth grade, when the Student was found eligible for special education services, he has continued to struggle with writing, work completion, and staying on task. (Tr. 973, 1055-1056) The Student is intelligent, with an IQ score that places him at the high average level, and he generally performs well academically in math and science classes. However, his OHI impairment, related to his ADHD and anxiety disorder, results in his difficulties with organization and attending to work. In addition, while he does fine with reading comprehension, he has consistently displayed significant problems with writing.

The Student's May 2017 IEP called for him to receive 45 minutes of special education services per week, which included 40 minutes daily of a staff-supported study hall to check academic status and to provide support in work completion, writing tasks, and time management and five minutes per day when special education staff would check the Student's assignment notebook. The May 2017 IEP reduced the amount of speech and language services the Student would receive, down from 20 minutes twice per week his freshman year, to 20 minutes once per week.

Susan Carneol, who conducted a speech and language evaluation of the Student, testified that a reading specialist or special education teacher providing 15 or 20 minutes per day, twice per week, of direct instruction in spelling and written expression would be "not at all" sufficient to help the Student improve in those areas. She testified that, based on scientific research, "best practice would probably be a minimum [of] a half hour, 45 minutes, maybe even an hour, if not five days a week, [then] four days a week, or something equivalent." While the District was not legally obligated to provide the Student with the optimal or best special education services, it also should not have been providing the Student with insufficient services to meet his individual needs and that allowed him to make merely *de minimus* progress. For the 2017-2018 school year, the District reduced the Student's speech and language services in half, to 20 minutes only once per week, despite the Student continuing to have difficulties in that area. Also concerning was the fact that the District's speech and language pathologist testified that she sometimes had to pull the Student out of the special education-supported study hall to provide him with speech and language therapy, meaning that he then did not receive the study hall services. (Tr. 1385-1387)

The goals in the Student's IEP for his sophomore year were somewhat reworded and rearranged from his freshman year IEP, but generally, the goals related to work completion, attending, and writing remained extremely similar. The baselines for some of the goals in his 2017-2018 were rather shockingly low, such as for goal 1, which had a baseline of zero because the Student did "not exhibit the ability to independently seek out clarification on content and expectations or support for missing work." (Ex. 70) For goal 3, related to work completion, the baseline established that the Student was able to independently complete assigned coursework and submit it by the due date only 25% of the time. *Id.*

Mr. Heitzkey testified that he thought the Student's IEP for the 2017-2018 was appropriate to meet his needs and provide FAPE, and Ms. Stautz testified that the IEP team apparently had felt that the Student had done well in 9th grade when he received more direct instruction in Reading to Succeed and thought he needed less direct instruction in writing as a

sophomore. (Tr. 1470) However, the Parent was concerned about the Student receiving some F and D grades and not completing written assignments during the first semester of his sophomore year, so she requested that an IEP team meeting he held to review his IEP. The Parent believed that the Student needed more special education support in order to complete his writing assignments. Nevertheless, no revisions were made to the Student's IEP at the November 2017 IEP meeting.

Mr. Heitzkey and Ms. Kunick both testified that they thought the Student made some progress in his writing in 10th grade and that, with rather significant assistance from them, the Student was capable of writing at grade level. However, in contrast, Ms. Kunick also testified that, because of "the infrequency and reluctance" of the Student to write, she could not establish "a mode or trend in learning" in the area of writing. Therefore, she and Mr. Heitzkey decided not to give the Student a grade in the specific area of writing, and although it was one of the five areas in the class that were supposed to be part of a student's overall grade, they did not consider the Student's writing when they gave him a C- for the second semester in 10th grade American literature. If he had been writing at grade level, or even below grade level on a consistent basis, one would assume that his writing could have properly been included in determining his overall grade, as it was the norm for the class.

Mr. Heitzkey also testified that he believed the goals in the Student's sophomore IEP were appropriate. However, Mr. Heitzkey also acknowledged during his testimony that, by the end of the 2017-2018 school year, the Student had not achieved several of the goals that were contained in his IEP for his freshman year, the 2016-2017 school year, much less the goals in his sophomore IEP. (Ex. 6, Tr. 1137-1140) Mr. Heitzkey conceded that, by the end of the Student's sophomore year, the Student was not close to being able to record his daily assignments with 90% accuracy or organize and manage his time with 85% accuracy, which were expectations in goal 1 of his freshman year IEP. (Tr. 1137-1139) The Student also was unable to independently write a paragraph that met the 9th-10th grade standards for "Developing" by the end of his sophomore year, and this had been part of goal 3 in his freshman year IEP. (Tr. 1139-1140) Mr. Heitzkey also acknowledged that, by the end of his sophomore year, the Student was "close" but not able to have his papers in assigned folders four out of five times and was not able to stay on task in small and large group settings for 10 minutes with no more than one teacher prompt 80% of the time – both of which had also been goals in his freshman year IEP. (Tr. 1139-1140)

Mr. Heitzkey also admitted that he did not provide the Parent with quarterly, written progress reports that were required by the Student's IEP during the 2017-2018 school year. (Tr. 1114-1115) Ms. Stautz testified that the Parent's repeated requests to have the Student's spelling and writing level evaluated should have been granted by the District. (Tr. 1470) When Ms. Mintie assessed the Student's writing sample in April 2018, she determined that the paragraph was written at a third to fourth grade level.

Based upon all of the evidence described above, I find that the District did not provide a FAPE to the Student during the 2017-2018 school year. The IEP and special education and related services offered to the Student allowed him to make only *de minimus* progress in most of the areas where he required special education, particularly writing, organization, work

completion, and advocacy. Based on the credible evidence on the record, I cannot conclude that the Student's IEP was reasonably calculated to enable him to make progress appropriate in light of his unique circumstances.

### Appropriateness of the May 2018 IEP and Tuition Reimbursement

Under the IDEA, if a parent unilaterally places his or her disabled child in a private school without the consent of the school district, an administrative law judge may require the district to reimburse the parent for the cost of that enrollment if the administrative law judge finds that the district did not make FAPE available to that student ... and that the private placement is appropriate. 20 U.S.C. § 1412(a)(10)(C).

Reimbursement for tuition costs may be denied if the parent did not inform the IEP team that the parent was rejecting the placement proposed by the school district and intending to enroll the child in private school at the most recent IEP meeting prior to removal, or ten days prior to the removal. In addition, the cost of reimbursement may be denied upon a judicial finding of unreasonableness with respect to the actions taken by the parent. 20 U.S.C. § 1412(a)(10)(C)(iii)(I).

The relevant provisions of the IDEA are as follows:

(C) Payment for education of children enrolled in private schools without consent of or referral by the public agency

> (i) In general
>
> Subject to subparagraph (A), this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.
>
> (ii) Reimbursement for private school placement
>
> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.
>
> (iii) Limitation on reimbursement

The cost of reimbursement described in clause (ii) may be reduced or denied—

> (I) if--

>> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

>> (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

> (II) if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 1415(b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

> (III) upon a judicial finding of unreasonableness with respect to actions taken by the parents.
> 20 U.S.C. § 1412(a)(10)(C). *See also* Wis. Stats. § 115.791 (1) and (2).

When considering the appropriateness of a tuition reimbursement request by a parent, the first question to be addressed is whether the District offered the Student FAPE. Here, an IEP team meeting was held on May 23, 2018 to review and revise the Student's IEP and develop an IEP for his junior year. The IEP team was unable to complete its review and revision of the IEP on May 23. However, because the prior IEP was set to expire on May 31, 2018, the May 23 IEP took effect. The IEP team planned to reconvene in the summer to continue reviewing, revising, and developing the IEP.

Ms. Stautz and the Parent agreed that it was practical and beneficial to wait until mid-August to reconvene the IEP team meeting, after the Student finished the educational program he was enrolled in at Lindamood-Bell. In mid-August, Ms. Stautz sent two emails to the Parent asking her to provide dates she was available for an IEP meeting. The Parent did not provide dates and instead expressed her frustration that, in her opinion, the District had not met the Student's educational needs for years and that Mr. Heitzkey had fraudulently altered the Student's writing on assignments and exams in Google Docs.

The Parent informed the District on August 17, 2018 that she was removing the Student from the District and unilaterally enrolling him in a private school, Brehm, and that she would be seeking reimbursement for the cost of the Student attending Brehm. She did not respond to another email from Ms. Stautz on August 17, 2018, in which the District offered to hold a facilitated IEP meeting or engage in mediation.

The District did not schedule or hold an IEP team meeting to finalize the Student's IEP between August 17, 2018 and September 4, 2018, the date that the Parent had anticipated the Student would start at Brehm. On August 30, 2018, the District informed the Parent by email that it would hold an IEP meeting on September 7, 2018. On that same date, Brehm notified the District that the Student was enrolled in the school for the 2018-2019 school year, which had begun on August 27, 2018.

Districts are legally required to provide notice of IEP meetings to parents and must attempt to involve the parent(s) in a child's IEP team meetings so that parent has the opportunity to participate in developing the child's IEP. 34 CFR § 300.322(b)(1) and 34 CFR § 300.501(b). As such, it is admirable that Ms. Stautz emailed the Parent on two occasions asking her for dates to reconvene the IEP meeting and also emailed her to offer a facilitated IEP meeting or mediation.

However, the District is ultimately responsible for offering and having an IEP in effect for the Student that is reasonably calculated to enable him to make progress appropriate in light of his unique circumstances. Indeed, a school district can conduct, and is obligated to conduct, an IEP meeting without a parent in attendance when the district is unable to convince the parent to attend, and an IEP needs to be developed for a student with a disability. 34 CFR § 300.322(d) *See Board of Educ. of the Toledo City Sch. Dist. v. Horen,* 55 IDELR 102 (N.D. Ohio 2010)

Here, the District never held another IEP team meeting to further review, revise, and develop the Student's IEP for the 2018-2019 school year. It could have, and should have, scheduled another IEP team meeting, with or without the Parent's input. The Parent did not prevent the District from scheduling an IEP team meeting in August 2018. Moreover, the Parent provided notice that she was removing her child from the District in an email to the District Superintendent. The District's policies of waiting to get a records request from the new school and/or requiring a parent to call the guidance office to unenroll a child from school do not justify the District's failure to hold the IEP meeting and cannot reasonably serve to transfer the blame to the Parent for the District's failure to schedule the IEP meeting.

Accordingly, the May 23, 2018 IEP stands as the IEP that the District offered to the Student for the 2018-2019 school year. The May 2018 IEP reduced the amount of special education services to the Student to 40 minutes once per day in a special education-supported study hall. The IEP removed the five minutes of assignment notebook check from the Student's IEP. (Ex. 72) While the assignment notebook check had not been effective, and largely not followed during the prior school year, the revised IEP did not include other services to replace it, despite the Student inarguably continuing to have serious problems with organization and work completion.

The May 2018 IEP again included only 20 minutes per week of speech and language services in the speech room, despite the Student continuing to have deficits in communication. The District's speech and language pathologist testified that had to sometimes pull the Student out of study hall to provide speech and language services and that she did not have sufficient time to observe or work with the Student on speech and language services in the regular education classroom. (Tr. 1380-1382, 1391)

Three of the goals from the Student's prior IEP had not been met during his sophomore year. Nevertheless, the advocacy goal continued in the May 2018 IEP with the baseline remaining at zero and the level of attainment being lowered from 50% success expected to 40%. The work completion goal from the May 2017 IEP was removed and replaced with a similar study skills goal that set the baseline at zero, with a 50% attainment level. The writing goals were renumbered but remained essentially the same with a zero baseline set for the writing goal 3. (Ex. 72)

Ms. Stautz testified that the May 2018 IEP could have been revised, and the District could have included more services for the Student, including more direct instruction in writing and more speech and language services. In fact, Ms. Stautz testified that the District could have offered and provided virtually all of the services to the Student that he has been receiving at Brehm during the 2018-2019 school year. (Tr. 1462-1470) Nevertheless, even if true, the fact remains that what the District did offer the Student was what was in the May 2018 IEP. For the reasons discussed above, I find that the District failed to offer an IEP to the Student for the 2018-2019 school year that was reasonably calculated to enable the Student to make progress appropriate in light of the Student's circumstances and thereby receive a FAPE.

The Parent provided the District with prior written notice that she was removing the Student from the District and was unilaterally enrolling him at Brehm for the 2018-2019 school year. (Ex. 42) Ms. Stautz acknowledged in an email on August 17, 2018 that the District had received the Parent's email about enrolling the Student at Brehm.

The District argued that the Parent is not entitled to payment from the District for the cost of the Student attending Brehm, on the grounds that Brehm is not an appropriate placement and that the Parent acted unreasonably. The District's first argument fails because the educational plan and extensive, credible testimony of the Student's teachers at Brehm show that it is an appropriate placement for the Student. (Ex. 2) The Student's teachers at Brehm testified that the Student is making progress at Brehm and that they believe the educational services he is receiving at Brehm are appropriate for him. (Tr. 82, 257, 345, 484-484, 520-522, 535-536) The Student testified that he has received a lot of help with his writing at Brehm, but the teachers there do not write for him. (Tr. 294)

The District also argued that the Parent acted unreasonably by unilaterally placing the Student at Brehm, claiming that "the real reason" that she decided to remove him from the District was because the District did not fire Mr. Heitzkey and that the Parent's concerns about the Student's education in the District were "always clouded by [her] relentless pursuit of

meritless criminal accusations that [Mr. Heitzkey] fraudulently altered [the Student's] academic work. *District's post-hearing brief, p. 1, and District's reply brief, p. 2.* The District also argued that the Parent prevented the IEP team from reconvening to further revise and develop the Student's May 2018 IEP.

The evidence on the record does not support the District's argument that the Parent is not entitled to reimbursement because she acted unreasonably. As discussed previously herein, the Parent cannot reasonably be blamed for the District's failure to schedule and hold an IEP team meeting in August 2018. The fact that the Parent did not respond to two emails with dates she was unavailable for an IEP meeting does not rise to the level of unreasonableness that would justify denying her otherwise legally valid request for reimbursement of the costs of a unilateral private school placement.

With regard to the Parent's allegations that Mr. Heitzkey altered and/or added to the Student's writing, it is apparent that the Parent does not possess a sound legal understanding of the terms forgery and fraud. The Parent acknowledged at the hearing that she had improperly or inaccurately referred to Mr. Heitzkey's work on the Student's assignments on Google Docs as "forgery" in that forgery involves money. (Tr. 647) I would agree that the Parent over-reacted to what she found on Google Docs by reporting it to law enforcement agencies and that she mischaracterized Mr. Heitzkey's conduct as being criminal in nature. However, a lay person's review of some of the Student's assignments and written exams with the editing history shown on Google Docs could reasonably lead a person to believe that Mr. Heitzkey had, indeed, done considerably more writing than the Student did on some assignments and written exams. (Ex. 11 and 12)

While the Parent's response to Mr. Heitzkey's actions on Google Docs was perhaps excessive and overblown, her conduct was not substantially related to her unilateral placement of the Student and request for reimbursement. She testified that the Heitzkey situation accounted for "20%" of her decision to place the Student at Brehm. (Tr. 709-710) There is ample evidence on the record showing that the Parent had made her frustration and concern about the Student's lack of progress, particularly in writing, known to the District for years. The evidence simply does not support the District's contention that the "real reason" that the Parent unilaterally placed the Student at Brehm was related to the Heitzkey situation.

Pursuant to the IDEA and Wisconsin statutes, I find that the Parent is entitled to reimbursement from the District and that the District is legally obligated to pay for the cost of the Student attending Brehm, specifically the cost of the Student's tuition and transportation.

All of the arguments presented by the parties were carefully considered by the undersigned administrative law judge. Any arguments and evidence on the record that were not specifically mentioned were determined to not merit comment in the decision.

CONCLUSIONS OF LAW

1. The District failed to provide the Student with a free, appropriate public education during the 2017-2018 school year.

2. The District failed to offer an individualized education program (IEP) for the 2018-2019 school year that would have provided the Student a free, appropriate public education and was reasonably calculated to enable the Student to make progress appropriate in light of the Student's unique circumstances.

3. The District is obligated to pay for the cost of the Student attending the Brehm Preparatory School, where he was unilaterally placed by the Parent in August 2018.

AMENDED ORDER

It is HEREBY ORDERED that the District pay for the cost of the Student attending the Brehm Preparatory School during the 2018-2019 and 2019-2020 school years, namely the cost of the Student's tuition and transportation to and from the school at the beginning and end of the school year(s) and for holidays or other breaks when the school is closed.

It is FURTHER ORDERED that the Parent provide the District with copies of invoices or receipts for the Student's tuition and transportation costs for the 2018-2019 and 2019-2020 school years.

Dated at Madison, Wisconsin on July 18, 2019.

STATE OF WISCONSIN
DIVISION OF HEARINGS AND APPEALS
5005 University Avenue, Suite 201
Madison, Wisconsin 53705-5400
Telephone:    (608) 266-7709
FAX:          (608) 264-9885

By: _____
Sally Pederson
Administrative Law Judge

APPEAL RIGHTS FOLLOW ON NEXT PAGE

## NOTICE OF APPEAL RIGHTS

APPEAL TO COURT: Within 45 days after the decision of the administrative law judge has been issued, either party may appeal the decision to the circuit court for the county in which the child resides under §115.80(7), Wis. Stats., or to federal district court pursuant to U.S.C. §1415 and 34 C.F.R. §300.512.

A copy of the appeal should also be sent to the Division of Hearings and Appeals, 5005 University Avenue, Suite 201, Madison, WI 53705-5400.

**The Division will prepare and file the record with the court only upon receipt of a copy of the appeal. It is the responsibility of the appealing party to send a copy of the appeal to the Division of Hearings and Appeals. The record will be filed with the court within 30 days of the date the Division of Hearings and Appeals receives the appeal.**