# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

Grafton School District,

                    Plaintiff,

v.                                         Case No. 19-cv-1179

J.L., a minor, by and through
his parent and next friend, L.L.,

                    Defendants.

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO PRELIMINARILY ENJOIN THE ALJ DECISION & ORDER PENDING RESOLUTION OF THIS CASE ON THE MERITS

## I.      INTRODUCTION

On September 26, 2019, Plaintiff Grafton School District (GSD) moved this court to preliminarily enjoin the Administrative Law Judge's Decision, which it has appealed. Said decision orders the GSD to reimburse the defendant L.L. (Parent) for the tuition and transportation costs for her son, defendant J.L. (Student) to attend the Brehm Preparatory School (Brehm) for two years. (Complaint Ex. 1, p. 24, hereinafter "ALJ Amended Decision"). Defendants J.L, a minor by and through his parent and next friend, L.L., through their attorney, Jeffrey Spitzer-Resnick, hereby submit this brief opposing defendants' motion.

## II.      PROCEDURAL HISTORY

On January 25, 2019, L.L., through her attorney, requested a due process hearing under Wis. Stats. Ch. 115 and the federal Individuals with Disabilities Education Act (IDEA), against the GSD. (ALJ Amended Decision, p. 1). A due process

hearing took place on March 25-27, 2019, and continued on April 29-30, 2019. The ALJ issued a decision on July 1, 2019, but due to the GSD's request for clarification, the ALJ amended the decision on July 18, 2019. (ALJ Amended Decision p. 1).

On August 15, 2019, the GSD filed a Complaint in this matter, which appeals the ALJ's Amended Decision. (Compl., ECF 1). Prior to the court convening a scheduling conference in this matter, the GSD filed the motion now before the court alleging that it meets the criteria for a court to issue a preliminary injunction to stay the ALJ's order to reimburse the Parent. It further argues that if the court grants its motion to stay the ALJ's order, it should not have to post a bond. For the reasons set forth below and based on the record as a whole, the court should deny the GSD's motion in its entirety.

III.     **STANDARD OF REVIEW**

In reviewing an ALJ's decision under the IDEA, courts are obligated to "give 'due weight' to the results of the administrative decisions." *Madison Metropolitan School Dist. v. P.R. ex rel. Teresa R.,* 598 F. Supp. 2d 938, 946 (W.D. Wis. 2009) *citing and quoting, Board of Education of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176 206 (1982). The "Seventh Circuit has interpreted 'due weight' to mean that courts must review the state hearing officer's findings of fact deferentially." *Id.*, *citing, Board of Education v. Ross,* 486 F. 3d 267, 270; *Heather S. v. State of Wisconsin*, 125 F. 3d 1045, 1053 (7th Circ. 1997); *Board of Education of Murphysboro Community Unit School District No. 186 v. Illinois State Board of Education*, 41 F. 3d 1162, 1167 (7th Cir. 1994).

2

Given that this motion, and likely the entirety of the GSD's appeal will be decided on a review of the administrative record, the court "owes considerable deference to the hearing officer and may set aside the administrative order only if it is "strongly convinced that the order is erroneous." *Id., quoting, School District of Wisconsin Dells v. Z.S.*, 295 F. 3d 671, 675 (7th Cir. 2002). Accordingly, the GSD's burden on this motion to establish that it is "reasonably likely" to succeed on the merits of its appeal is very high. *Christian Legal Society v. Walker*, 453 F. 3d 853, 859 (7th Cir. 2006).

## IV. STATEMENT OF FACTS

Since the court must defer to the hearing officer in this matter, for the purposes of this motion, the most salient facts, all of which cite evidence established in the administrative record, are set forth in the ALJ's Amended Decision as follows.

When J.L. was in fourth grade, he was diagnosed with an anxiety disorder. (ALJ Amended Decision, p. 2-citing Admin. Record Ex. 5, p. 1-See Decl. of Christine Hamiel in Support of Plaintiff's Motion for Preliminary Injunction[1], ¶ 4, Ex. 2).

During the 2011-12 school year, J.L. began to attend school in the GSD, under Wisconsin's Open Enrollment program. (ALJ Amended Decision, p. 3-citing Admin. Record Tr. 562-See Decl. of Jeffrey Spitzer-Resnick, ¶ 3, Ex. 1). At that point, he received accommodations under a 504 plan because his former school district had previously identified him as a student with a disability under Sec. 504 of the federal Rehabilitation Act. (ALJ Amended Decision, p. 2-citing Admin. Record Tr. 943-See Decl. of Jeffrey Spitzer-Resnick, ¶ 3, Ex. 1).

---

[1] Hereinafter Hamiel Decl.

3

At the time of the administrative hearing in this matter, J.L. was 16 years old. He attended school in the GSD from 4th-10th grade. (ALJ Amended Decision, p. 2- citing Admin. Record Tr. 562-See Decl. of Jeffrey Spitzer-Resnick, ¶ 3, Ex. 1).

In June of 2014, when J.L. was in sixth grade, the GSD evaluated him for special education eligibility and determined that he was eligible under the category of other health impairment (OHI) disability and was in need of special education and related services, due to his attention deficit disorder (ADD) and anxiety. The IEP team determined that J.L. "struggled with attention, focus, organization and written output since at least second grade," and that his work completion was "significantly delayed relative to his peers." (ALJ Amended Decision, p. 3-citing Admin. Record Ex. 69-See Decl. of Jeffrey Spitzer-Resnick, ¶ 4, Ex. 2).

Upon completing the evaluation, the Individualized Education Program (IEP) team developed an IEP for J.L's seventh grade year. The IEP noted that his work production was highly inconsistent; his mood was quick to change, including refusing to work, crying and collapsing on the floor. He demonstrated "silly" or unexpected behaviors, such as sitting under the table. He was disorganized, quick to anger or cry when things did not go as he expected, and he struggled to make simple decisions. His disability impacted his ability to keep up with the pace and scope of the regular education curriculum and caused him to miss instruction in class. His lack of organization interfered with his work completion in and outside of the classroom and written tasks presented a significant challenge for him across subject areas. *Id.*

4

In January 2015, when J.L. was in 7th grade, his mother obtained a consultative report from Handwriting Problem Solutions, which determined that he showed signs of dysgraphia, a neurological disorder of written expression. His mother gave the report to the GSD as it included several recommendations to help him improve his writing. (ALJ Amended Decision, p. 4-citing Admin. Record Ex. 57-See Decl. of Jeffrey Spitzer-Resnick, ¶ 5, Ex. 3).

This finding of dysgraphia was further substantiated in April 2015, through a neuropsychological evaluation conducted by Dr. Frank Gallo, which showed that J.L. has intelligence in the high average range, but that his spelling was at a mid-third grade level. Dr. Gallo made suggestions to the GSD regarding J.L.'s organizational, attention, writing and expression difficulties. (ALJ Amended Decision, p. 4-citing Admin. Record Ex. 47-See Decl. of Jeffrey Spitzer-Resnick, ¶ 6, Ex. 4).

In May 2015, the GSD held an IEP meeting and developed an IEP for J.L. for 8th grade. That IEP only provided 10 minutes/week of special education services, although other supplementary aids and supports were to be provided in the general education classroom. (ALJ Amended Decision, p. 3-citing Admin. Record Ex. 71-See Decl. of Jeffrey Spitzer-Resnick, ¶ 7, Ex. 5).

In February 2016, the GSD informed J.L.'s mother that he had not been receiving special education support in class as required by his IEP. (ALJ Amended Decision, p. 5-citing Admin. Record Tr., 564-565, 1009-See Decl. of Jeffrey Spitzer-Resnick, ¶ 3, Ex. 1).

In April 2016, Susan Carneol conducted a speech and language evaluation of J.L. (ALJ Amended Decision, p. 5-citing Admin. Record Tr. 112-114-See Decl. of

5

Jeffrey Spitzer-Resnick, ¶ 3, Ex. 1). Her reported found "noticeable weakness and phonological memory and clinical observations of word retrieval difficulties characteristic of Dyslexia." Among other things, Ms. Carneol recommended that he receive "direct intervention from the reading specialist or special education teacher on a program to improve spelling strategies and written expression." (ALJ Amended Decision, pp. 5-6-citing Admin. Record Ex. 5, p. 1-See Hamiel Decl., ¶ 4, Ex. 2).

At the recommendation of Ms. Carneol, J.L. had another neuropsychological evaluation in April and May 2016, which noted that his findings were consistent with the previous assessment, "except that [J.L.'s] writing skill has not progressed at age-expected rate since his first neuropsychological evaluation at age 7 years." Ms. Carneol also recommended that a tutor be provided to J.L. (ALJ Amended Decision, pp. 6-7-citing Admin. Record Ex. 7-See Decl. of Jeffrey Spitzer-Resnick, ¶ 8, Ex. 6).

In June 2016, the GSD held an IEP meeting and developed an IEP for J.L.'s 9th grade year. This IEP contained four goals, including:

- Improving J.L's organizational skills to the point where he could record daily assignments with 90% accuracy and complete them with 85% accuracy;

- Independently writing a paragraph that meets the Grafton High School Writing Rubric for 9/10 grade;

- Improve his academic skills by beginning a task within 1 minute and staying on tasks for 10 minutes with no more than 2 prompts 80% of the time;

- Improve his verbal and written expression by producing a 5 sentence paragraph in a 20 minute period; explain and demonstrate active listening strategies with 100% accuracy in a 3-5 minute conversation; recalling 80%

6

of the information he hears; and demonstrating 2-3 self-cueing strategies to facilitate word retrieval during verbal discourse with an adult during at least a 3 minute conversational exchange.

*Id.,* at pp. 7-9.

During the summer of 2016, the GSD hired Lisa Chase, a private tutor to work with J.L. on his language and writing skills as compensatory education for its failure to provide him with special education support in his English/language arts class during the first semester of the 2015-16 school year. Ms. Chase recommended that J.L. have a study hall each school day with a teacher who was trained in working with students who had ADHD and problems with written expression. (ALJ Amended Decision, p. 9-citing Admin. Record Tr. 63-67-See Decl. of Jeffrey Spitzer-Resnick, ¶ 3, Ex. 1). His mother e-mailed Susanne Lilly, the GSD's Director of Special Education, at the time and asked that the IEP team meet to revise his IEP and include Ms. Chase's suggestions. . (ALJ Amended Decision, p. 9-citing Admin. Record Ex. 3-See Decl. of Jeffrey Spitzer-Resnick, ¶ 9, Ex. 7). His mother offered to pay for a dyslexia tutor to provide these services, but the GSD rejected her offer, and his IEP was not revised to include these services. (ALJ Amended Decision, p. 9-citing Admin. Record Tr. 567-570; 1010; 1024-1025-See Decl. of Jeffrey Spitzer-Resnick, ¶ 3, Ex. 1).

On May 15, 2017, L.L. sent an e-mail to her son's case manager and special education teacher, Adam Heitzkey, and his 9th grade Read to Succeed teacher to have his writing evaluated. . (ALJ Amended Decision, p. 3-citing Admin. Record; Ex. 24; Tr. 574-See Decl. of Jeffrey Spitzer-Resnick, ¶¶ 3, 10, Ex. 1, 8).

7

On May 31, 2017, J.L.'s IEP team met and revised his IEP for the 2017-18 school year, his sophomore year in high school. The IEP provide a supported study hall to provide support in work completion, writing tasks and time management for 40 minutes per day; an assignment notebook check near the end of every day; and 20 minutes of speech and language services per week, which was half the amount in the prior IEP. (ALJ Amended Decision, p. 9-citing Admin. Record Ex. 70-See Hamiel Decl. ¶ 6, Ex. 4).

The May 2017 IEP contained six goals as follows:

- "Advocacy…[J.L.] will independently seek out clarification of content and expectations or support for missing work in 5 out of 10 opportunities." His baseline was that he was not doing this at all.

- "Attending-behavior"-when off-task behavior emerges and he requires redirection to the class activity or expected task, he will respond appropriately and comply with the request 80% of the time. His baseline for doing this was 40%.

- "Academic goals-work completion"-J.L. was to independently complete assigned coursework and submit it by the due date 60% of the time. His baseline has been 25%.

- "Writing"-J.L. was to be able to independently, with teacher feedback on drafts, complete assigned course work at the beginning/developing level of grade 9/10 writing rubric by the due date 60% of the time. His baseline had been 25%.

- "List at least 5 words/thoughts associated with given topic and then produce a sentence for each word or thought and sequence sentences in a relevant order to produce a 5 sentence paragraph with 80% accuracy." His baseline was 50%.

- "Independently demonstrate active listening strategies with 90% accuracy while participating in a 3-5 minutes (*sic)* conversation." His baseline was 70% accuracy.

*Id.*, at pp. 9-10.

The May 2017 IEP required that quarterly reports about J.L.'s progress towards meeting his annual goals be provided to his mother. *Id.,* p. 10. J.L.'s case manager, Mr. Heitzkey, did not provide these reports during the entire 2017-18 school year. (ALJ Amended Decision, p. 10-citing Admin. Record Ex. 78, Tr. 1114-1116-See Decl. of Jeffrey Spitzer-Resnick, ¶¶ 3, 11, Ex. 1, 9).

In November 2017, L.L. asked the GSD to convene an IEP team meeting due to her concerns that her son was not getting his English writing assignments done and had received some D and F grades on assignments.  (ALJ Amended Decision, p. 11-citing Admin. Record Ex. 28, Tr. 1010-1011-See Decl. of Jeffrey Spitzer-Resnick, ¶¶  3, 12, Ex. 1, 10). Although the IEP team met, no revisions were made to J.L.'s IEP. (ALJ Amended Decision, p. 11-citing Admin. Record Ex. 75, Tr. 1169-1171-See Decl. of Jeffrey Spitzer-Resnick, ¶¶ 3, 13, Ex. 1, 11).

Through an e-mail dated November 14, 2017, L.L. asked the GSD to evaluate her son's writing ability. (ALJ Amended Decision, p. 11-citing Admin. Record Ex. 28, -See Decl. of Jeffrey Spitzer-Resnick, ¶ 12, Ex. 10). She followed this up with e-mails

to Mr. Heitzkey repeating her request for a writing evaluation on February 17, 2018 and March 27, 2018. (ALJ Amended Decision, p. 11-citing Admin. Record Ex. 29, 30, - See Decl. of Jeffrey Spitzer-Resnick, ¶¶ 14, 15, Ex. 12, 13).

Finally, in April 2018, Elizabeth Mintie, the District's college and career instruction specialist did an assessment of J.L. writing level, based upon a paragraph he wrote in his English class. She determined that his writing was at a 3rd-4th grade level. (ALJ Amended Decision, p. 11-citing Admin. Record Ex. 13, Tr. 310-311, 316-318, 1187-See Decl. of Jeffrey Spitzer-Resnick, ¶¶ 3, 16 Ex. 1, 14).

J.L. received a C in American literature and composition first semester and a C- second semester, and a D+ in space sciences, among other grades. (ALJ Amended Decision, p. 11-12-citing Admin. Record Ex. 76, -See Hamiel Decl. ¶ 7, Ex. 5). However, his teachers did not consider or include his writing in determining his grade in American literature and composition. (ALJ Amended Decision, p. 12-citing Admin. Record Ex. 79, Tr. 1234-1235-See Decl. of Jeffrey Spitzer-Resnick, ¶¶ 3, 17, Ex. 1, 15).

J.L did not fill out his assignment notebook at all during the 2017-18 school year. (ALJ Amended Decision, p. 12-citing Admin. Record Ex. 12, Tr. 588-589, 1061-1064-See Decl. of Jeffrey Spitzer-Resnick, ¶¶ 3, 18, Ex. 1, 16).

As of May 20, 2018, J.L. had 44 missing assignments for the 2017-2018 school year. (ALJ Amended Decision, p. 12-citing Admin. Record Tr. 621-622-See Decl. of Jeffrey Spitzer-Resnick, ¶ 3, Ex. 1).

J.L. was resistant to and did not utilize the Speech to Text technology that was offered to him in his IEPs. (ALJ Amended Decision, p. 12-citing Admin. Record Ex. 70 and 72, Tr. 1075, 1078, 1132-1133-See Hamiel Decl. ¶¶ 6, 9, Ex. 4, 7).

On May 23, 2018, the GSD held an IEP meeting to develop J.L.'s IEP for the following year. Mr. Heitzkey provided a draft to L.L. at the start of the meeting. (ALJ Amended Decision, p. 12-citing Admin. Record Ex. 36, Tr. 623-624-See Decl. of Jeffrey Spitzer-Resnick, ¶¶ 3, 20, Ex. 1, 18). This IEP showed that J.L. did not achieve three of his six goals in his prior IEP, specifically the goals of advocacy, attending and writing. (ALJ Amended Decision, p. 12-citing Admin. Record Ex. 72, Tr. 1213-1214-See Decl. of Jeffrey Spitzer-Resnick, ¶¶ 3, Ex. 1; Hamiel Decl. ¶ 9, Ex 7). However, the team did not finish developing J.L.'s IEP at that meeting, although it did complete its review and drafting of his annual goals. (ALJ Amended Decision, pp. 12-13-citing Admin. Record Tr. 1000-See Decl. of Jeffrey Spitzer-Resnick, ¶ 3, Ex. 1).

On May 30 and 31, 2018, the GSD e-mailed L.L. and informed her that since it was required to complete J.L's annual IEP by May 31, 2018, the IEP that was partially completed at the May 23rd meeting would be in effect as a "place holder" until the IEP team reconvened to continue its review and revision of the IEP. (ALJ Amended Decision, p. 13-citing Admin. Record Ex. 73, Tr. 966-967-See Decl. of Jeffrey Spitzer-Resnick, ¶¶ 3, 20, Ex. 1, 18).

The May 2018 IEP called for the GSD to provide J.L. with 40 minutes of special education services once per day to work on his writing, time management, work completion, improve his understanding of his academic status and improve his self-advocacy. It also included 20 minutes/week of speech and language services.

11

The supplementary aids and supports were the same as in the May 2017 IEP except that the use of an assignment notebook was removed. (ALJ Amended Decision, p. 10-citing Admin. Record Ex. 72, See Hamiel Decl. ¶ 9, Ex. 7).

The May 2018 IEP goals included:

- "Advocacy-When [J.L.] encounters a need for clarification on expectations or direction on academic tasks, he will independently seek out support of his classroom teacher by raising his hand, approaching the teacher, or requesting another time to meet."

- "Attending-When given a single prompt to engage or re-engage in an individual classroom activity or task [J.L.] will be able to sustain attention to the activity or task for 15 minutes in non-preferred classes."

- "Writing-When given a pre-writing essay outline or graphic organizer, [J.L.] will be able to independently compose an academic paragraph that includes a topic sentence, a claim, evidence, a warrant, and a conclusion sentence."

- [J.L.] "will independently list at least 5 words/thoughts ideas associated with a personal choice topic and produce a complete sentence for each word/thought (5 sentences total) and sequence the sentence in a relevant order to produce a 5 sentence paragraph with 90% accuracy."

- [J.L.} "will independently demonstrate active listening strategies with 90% accuracy while participating in a variety of environments."

- "Study Skills-[J.L] will be able to independently determine what school work he needs to priorities and complete by checking Skyward, Canvas, and

12

communicating with his teacher to create a task list for study hall and at home."

*Id.,* at 13-14.

During the May 23, 2018 IEP meeting, the team discussed providing services to J.L. over the summer but did not conclude that discussion. (ALJ Amended Decision, p. 14-citing Admin. Record Tr. 648-See Decl. of Jeffrey Spitzer-Resnick, ¶ 3, Ex. 1). In June 2018, L.L. signed her son up to receive writing instruction at Lindamood-Bell, a private educational center over the summer, and she requested that the GSD pay for those services. Although these services were not included in J.L.'s IEP, the GSD agreed to pay for his attendance at Lindamood-Bell. (ALJ Amended Decision, p. 14-citing Admin. Record Ex. 72, 85, 86, Tr. 1436-1439-See Decl. of Jeffrey Spitzer-Resnick, ¶ 22, Ex. 20; Hamiel Decl. ¶¶ 9, 10, 12, Ex. 7, 8, 10).

The GSD failed to contact L.L. to reconvene the IEP meeting in mid-June 2018, as had been tentatively discussed by the IEP team members. As such, L.L. did not refuse to attend an IEP meeting that month. (ALJ Amended Decision, p. 14-citing Admin. Record, Tr. 651, 705-706-See Decl. of Jeffrey Spitzer-Resnick, ¶ 3, Ex. 1).

The GSD's new Director of Pupil Services e-mailed L.L. about reconvening the IEP to finalize it and they agreed that it would be beneficial to wait until J.L. had finished his instruction at Lindamood-Bell in mid-August 2018, so the IEP team could consider his evaluation from that program. (ALJ Amended Decision, p. 14-citing Admin. Record Ex. 85, Tr. 1431, 1434-See Hamiel Decl. ¶¶ 10, 16, Ex. 8, 14).

The GSD received an evaluation from Lindamood-Bell, which revealed that J.L. had made progress in some, but not all areas of instruction while there. In the

13

area of word attack, he made two to three years of growth. In the writing are of conceptual conventions, however, he remained at the 25th percentile, which is at about the 4th grade level. (ALJ Amended Decision, p. 15-citing Admin. Record Ex. 8, 87-88; Tr. 1444-1446-See Decl. of Jeffrey Spitzer-Resnick, ¶¶ 22-24, Ex. 20-22; Hamiel Decl. ¶ 16, Ex. 14).

On August 13 and 15, 2018, Ms. Stautz sent L.L e-mails asking her to provide dates that she would be able to reconvene the IEP meeting. L.L. wrote back, needs expressing her frustration with the GSD's failing to meet her son's needs in the past. L.L. did not provide dates during which she would be available for an IEP meeting. (ALJ Amended Decision, p. 15-citing Admin. Record Ex. 89-See Hamiel Decl. ¶ 11, Ex. 9).

On August 17, 2018, L.L. sent GSD Superintendent Jeff Nelson an e-mail notifying him that she intended to remove her son from the district and place him at Brehm Preparatory School (Brehm), in Carbondale, Illinois no later than September 4, 2018 and that she sought reimbursement from the GSD for the cost of J.L.'s attendance there. (ALJ Amended Decision, p. 15-citing Admin. Record Ex. 42-See Decl. of Jeffrey Spitzer-Resnick, ¶ 25, Ex. 23).

On August 30, 2018, Ms. Stautz e-mailed L.L. and stated that the GSD still considered J.L. to be a student there. She alleged that L.L. had "declined three times" to reconvene the IEP meeting so she informed L.L. that the GSD would hold an IEP meeting on September 7, 2018 to review the IEP and would mail an official invitation to the IEP meeting to L.L. (ALJ Amended Decision, p. 15-citing Admin. Record Ex. 90-See Decl. of Jeffrey Spitzer-Resnick, ¶ 26, Ex. 24).

14

On that same day, the GSD received a letter from Brehm's Director of Admissions stating that J.L. was enrolled there for the 2018-19 school year. (ALJ Amended Decision, p. 15-citing Admin. Record Ex. 91-See Decl. of Jeffrey Spitzer-Resnick, ¶ 27, Ex. 25).

During the 2018-19 school year at Brehm, J.L. has been receiving speech and language services every day for a total of 96 minutes/week, as well as speech and language services from a second speech and language therapist in a small group and individually for 47 minutes twice/week. In addition, he has been receiving content support instruction on a daily basis, totaling 94 minutes/week, in a small group of about six students with a teacher who assists with homework assignments. He also receives executive functioning and advisement services on a daily basis, totaling 100 minutes/week, to recap each day and work on problem-solving, organization, time management, self-empowerment, goal setting, and self awareness. His program also includes structured study hall five times/week for a total of nine hours/week, technology instruction once/week for 45 minutes, core class instruction for 940 minutes/week, personal fitness and wellness for 235 minutes/week, computer science for 141 minutes week and a photography, art, and computer technology class (PACT) for 470 minutes/week. (ALJ Amended Decision, pp. 15-16-citing Admin. Record Ex. 2, ,Tr. 172-179) See Decl. of Jeffrey Spitzer-Resnick, ¶¶ 3, 28, Ex. 1, 26).

The yearly tuition at Brehm is $78,850 year, not including the cost of transporting J.L. back and forth between his home and the school. (ALJ Amended

Decision, p. 16-citing Admin. Record Ex. 44-See Decl. of Jeffrey Spitzer-Resnick, ¶ 29, Ex. 27).

## V.  ARGUMENT

### A.  <u>The GSD Fails to Meet the Standards for a Preliminary Injunction.</u>

There is no dispute between the parties that this court has the power to issue a preliminary injunction to stay the results of the due process hearing pending the final outcome of this case. (See GSD br., p. 11). However, obtaining such a preliminary injunction, "is 'by no means automatic,' and the party seeking such an injunction bears the burden of demonstrating entitlement to such relief under the standards generally governing requests for preliminary injunctive relief." *Board of Education of Albuquerque Public Schools v. Maez,* No. 16-cv-1082, 2017 WL 3610546 (D.N.M. Jan. 18, 2017)[2], citing and quoting, *Wagner v. Bd. of Ed. of Montgomery County,* 335 F. 3d 297, 302-03 (4th Cir. 2003).

Thus, in this case, the parties agree that n order to obtain the preliminary injunction it seeks; the GSD has the burden of establishing whether:

- it is likely to prevail on the merits;

- it is likely to suffer irreparable harm without the injunction;

- the harm the GSD would suffer is greater than the harm that the preliminary injunction it seeks would cause to J.L. and L.L.; and

- whether the injunction is in the public interest.

(See GSD br., pp. 11-12).  *Judge v. Quinn*, 612 F. 3d 537, 546 (7th Cir. 2010).

---

[2] Plaintiff has already filed this unreported decision with the court, so Defendants will not provide an additional copy to the court.

Finally, the parties agree that the court should treat these four factors interdependently, i.e., "the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Id.*, citing *Hoosier Energy Rural Elec. Coop, Inc. v. John Hancock Life Ins. Co.,* 582 F. 3d 721, 725 (7th Cir. 2009). Typically, the primary reason why a court denies preliminary relief is its assessment of the movant's likelihood of success on the merits. *Id.* However, the movant must meet all four elements, as a court will not issue a preliminary injunction without a showing of irreparable harm to the movant. *Id.,* at 557.

Of course, "[I]f it is plain that the party seeking the preliminary injunction has no case on the merits, the injunction should be refused regardless of the balance of harms." *Green River Bottling Co. v. Green River Corp.*, 997 F. 2d 359, 361 (7th Cir. 1993). As defendants shall demonstrate below, the GSD has no case on the merits, and the injunction should be denied. Moreover, even if the court finds that the GSD has an arguable case on the merits, it fails to meet the other standards and requirements to obtain a preliminary injunction. As the court considers the GSD's motion, it must keep in mind that, "[A] preliminary injunction is an extraordinary remedy….It is never awarded as a matter of right." *Whitaker by Whitaker v Kenosha Unified School Dist. No. 1 Bd. of Educ.,* 858 F. 3d 1034, 1044 (7th Cir. 2017) (citations omitted).

**1.    It is unlikely that the GSD will succeed on the merits.**

The parties agree that the GSD must demonstrate that it is "reasonably likely" that it will succeed on the merits of this case. (GSD br., p. 12). *Christian Legal Society*

17

*v. Walker*, 453 F. 3d 853, 859 (7th Cir. 2006). However, that is where the parties' agreement ends, as contrary to its claims, the reality is that the GSD has virtually no chance of success on the merits.

In 2017, the Supreme Court clarified the standard for determining whether or not a school district has met its obligation to provide a student with disabilities a free appropriate public education (FAPE). *Endrew F. v. Douglas County School District*, 137 S. Ct. 988 (2017). In that case, just as in the case at bar, "Endrew's IEPs largely carried over the same basic goals and objectives from one year to the next, indicating that he was failing to make meaningful progress toward his aims." *Id.,* at 996. When the school presented Endrew's parents with an IEP that was pretty much the same as the past ones, they removed him from public school and enrolled him in a private school specializing in educating children with his disability-autism. *Ibid.* Fortunately, like J.L, Endrew did much better at the new school and he made progress "that had eluded him in public school." Endrew's parents sought to have his school district reimburse them for the cost his attendance at the private school. *Id.*, at 997.

Acknowledging that prior case law had left the standard for delivering FAPE somewhat unclear, the Supreme Court clarified the standard, by stating that, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.*, at 999. The Court went on to say that, "[T]he IEP must aim to enable the child to make progress. After all the essential function of the IEP is to set out a plan for pursuing academic and functional advancement." *Ibid.,* citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(IV). As the Court noted,

18

"[A] substantive standard not focused on student progress would do little to remedy the pervasive and tragic academic stagnation that prompted Congress to act." *Ibid.*

The school district must provide the child with instruction and services that allow him to "progress in the general education curriculum." *Ibid.*, at 1000, citing 20 U.S.C. § 1414(d)(1)(A)(i)(IV)(bb). For the first time, the Court added the requirement that the child's IEP must be "appropriately ambitious" because "every child should have the chance to meet challenging objectives." *Id.* The Court further emphasized that, "this standard is markedly more demanding than the 'merely more than *de minimis*'" standard that had been applied by the Tenth Circuit in the case below. *Id.*

As the Court made clear that,

a student offered an educational program providing "merely more than *de minimis*" progress from year to year can hardly be said to have been offered an education at all….[R]eceiving instruction that aims so low would be tantamount to "sitting idly…awaiting the time when they were old enough to drop out."

*Id.*, at 1001, citing and quoting *Board of Ed. of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 179 (1982).

In the case at bar, the ALJ appropriately relied upon the standard set forth in *Endrew F.* by thoroughly reviewing the facts of the case, with citations to the record for every one of her findings, as set forth above, and determined that,

the District did not provide a FAPE to the Student during the 2017-18 school year. The IEP and special education and related services offered to the Student allowed him to make only *de minimus* progress in most of the areas where he required special education, particularly writing, organization, work completion, and advocacy.

19

(ALJ Amended Decision, pp. 18-19). She further correctly found that, "[Based on credible evidence on the record" she could not "conclude that the student's IEP was reasonably calculated to enable him to make progress appropriate in light of his unique circumstances."

Regarding the 2018-19 school year, the regulations to the Individuals with Disabilities Education Act (IDEA) require that when revising the child's IEP, the team must "address (a)ny lack of expected progress toward the annual goals…and in the general curriculum." 34 C.F.R. § 300.324(b)(ii)(A). Yet, when the GSD convened J.L.'s IEP team in May 2018, it wrote an IEP that continued J.L. on the same stagnant trajectory of continually failing to meet key goals of writing, advocacy and attending, as he had in at least the previous two years.

While the GSD seeks to blame L.L. for its own failure to improve her son's 2018-19 IEP, as the ALJ found that District never scheduled, let alone held an IEP team meeting to revise the May 2018 IEP. She correctly found that, "the District is ultimately responsible for offering and having an IEP in effect for the Student that is reasonably calculated to enable him to make progress appropriate in light of his unique circumstances." (ALJ Amended Decision, p. 21). Responding to the District's claim that L.L. refused to cooperate with scheduling an IEP meeting, the ALJ correctly determined that, "a school district can conduct, and is obligated to conduct, an IEP meeting without a parent in attendance when the district is unable to convince the parent to attend, and an IEP needs to be developed for a student with a disability." *Id.,* citing 34 CFR § 300.322(d), other citation omitted.

The ALJ makes plain the obvious, that L.L. "did not prevent the District from

scheduling an IEP team meeting in August 2018," and rejected the District's efforts to "transfer the blame to the Parent for the District's failure to schedule the IEP meeting." *Id*

The ALJ then proceeded to note that the May 2018 IEP actually reduced the amount of special education services to J.L. and "the revised IEP did not include other services to replace" this loss, "despite the Student **inarguably** continuing to have serious problems with organization and work completion." *Id., emphasis supplied.*

The ALJ further noted that three of the Student's prior IEP goals had not been met and yet these goals remained with either the same or lowered expectations, and all three: advocacy, work completion and writing had a zero baseline. *Id.,* at 22. For all of these reasons, with thorough citation to the record, the ALJ found, "that the District failed to offer an IEP to the Student for the 2018-19 school year that was reasonably calculated to enable the Student to make progress appropriate in light of the Student's circumstances and thereby receive a FAPE." *Id.*

Moreover, minor enhancements to the 2017-18 IEP that failed to provide J.L. FAPE are insufficient to be reasonably calculated to provide him FAPE the following year. *Bd. of Educ. of Murphysboro Community Unit School Dist. No. 186 v. Illinois St. Bd. of Educ.*, 41 F. 3d 1162, 1167 (7th Cir. 1994).

It is important to note that despite J.L.'s challenges, the evidence shows that he is very intelligent and has enormous potential. Thus, "the educational benefit provided to the child 'must be gauged in relation to the child's potential,' so that when a student displays 'considerable intellectual potential,' the IDEA requires a

great deal more than a negligible [benefit]." *Nein v. Greater Clark County School Corp.*, 95 F. Supp. 2d 961, 974 (S.D. Ind. 2000) citing *Ridgewood Board of Education v. N.E.*, 172 F. 3d 238, 247 (3d Cir. 1999), quoting *Polk v. Central Susquehanna Intermediate Unit 16,* 853 F. 2d 171, 182, 185 (3d Cir. 1988).

The educational benefit offered in the May 2018 IEP by the GSD was doomed to keep J.L. stagnating as he had been throughout high school. That educational benefit "cannot be so low as to allow the district to squander [his] later potential for learning." *T.H. v. Board of Educ. of Palatine Community Consol. School Dist. 15*, 55 F. Supp. 2d 830, 842 (N.D. Ill. 1999). Indeed, in J.L.'s case, as he was about to enter 11th grade, there was precious little time to waste.

The GSD's claim that Brehm is an inappropriate placement for J.L. is similarly without merit. On this issue, the ALJ correctly found, with thorough citation to the record, that "the educational plan and extensive, credible testimony of the Student's teachers at Brehm show that it is an appropriate placement" for him. Critically, she found that he "is making progress at Brehm." (ALJ Amended decision, p. 22).

As this court considers the GSD's motion, it must keep in mind that "because courts lack special expertise in the area of educational policy, we must give 'due weight' to the results of the administrative decision." *Todd v. Duneland School Corp.,* 299 F. 3d 899, 905 (7th Cir. 2002), citing *Murphysboro*, at 1166. Moreover, the GSD bears the burden of proof as the party challenging the outcome of the ALJ's decision. *Id.* (citation omitted).

The parties are in general agreement about the requirement of the IDEA that school districts must provide FAPE to students through an IEP. (See GSD br., pp. 13-

14). However, it should be noted that the GSD's citation to 26 year old case that the IDEA only requires the district to "provide the educational equivalent of a serviceable Chevrolet,"[3] in no longer the standard, since the Supreme Court's decision in *Endrew F.* which requires "a school to offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 137 S. Ct. at 999.

The GSD inappropriately suggests that the ALJ improperly used hindsight to evaluate the district's denial of FAPE to J.L. (GSD br., p. 15). It does so by claiming that the ALJ specifically found that J.L. only made *de minimus* progress through his IEP and the services offered thereunder. Yet, the ALJ's finding was supported by her determination that J.L. had struggled for years to make progress and that his mother had repeatedly sought additional help and evaluation to improve his education. Moreover, it can hardly be called hindsight, when the district finally relented to L.L.'s repeated request that the district evaluate her son's writing, and the district's own staff found that this reasonably intelligent 10th grade student was writing at a 3rd-4th grade level. This is not hindsight. Rather, this is evidence of ongoing failure to provide FAPE, despite a mother's repeated cries for help.

The GSD's argument also ignores the fact that it admitted that it failed to implement J.L.'s IEP in its entirety in a number of ways, including failing to provide regular reports to L.L. on her son's progress, or lack thereof. The district cannot gain the benefit of its own failure to implement J.L.'s IEP by claiming that once the evidence of J.L.'s failure to receive FAPE was revealed, that is allegedly hindsight.

---

[3] See GSD br., p. 14 citing and quoting *Doe v. Bd. of Educ. of Tullahoma City Sch.,* 9 F. 3d 455, 459-60 (6th Cir. 1993).

23

Moreover, even after discovering how little progress, if any, J.L. was making, the ALJ found that the GSD failed to improve his 2018-19 IEP. Worse yet, it actually reduced the services it intended to provide to him.

This case is not the same as *Lessard v. Wilton Lyndeborough Corp.*, 518 F. 3d 18, 29 (1st Cir. 2008), where the argument between the parties was about "an esoteric definition of 'appropriate educational theories.'" In the case at bar, the GSD failed to implement J.L.'s IEP, and furthermore, even upon realization that he was doing so poorly in school, it failed to modify his IEP to remedy his repeated failure to meet half his IEP goals.

The GSD then goes on to critique the ALJ's reliance on the district's failure to enable J.L. to make progress on his IEP goals by claiming that the ALJ should have examined whether or not he was making progress in the general curriculum. (GSD br., p. 16). Yet, the district concedes that the ALJ found that the student's grade in American Literature and Composition failed to include his writing, which GSD staff testified was normally part of a student's grade. (See GSD br., p. 17, fn. 1). Glaringly absent from the district's brief is the plain fact that the reasonably intelligent J.L was writing 6-7 years behind grade level. For the district to suggest that such a student was making the reasonably ambitious progress envisioned by the Supreme Court in *Endrew F.* would mean that any reasonably intelligent child who somehow survives school despite the failures of the school district to provide an adequate IEP, and worse yet, despite its failure to implement that inadequate IEP, would have no legal recourse. There is simply no case that stands for such an absurd proposition. Rather, this specious argument reveals how thin the district's case is and why its motion for

24

a preliminary injunction should be denied.

The parties agree that the district is not required to provide "everything that might be thought desirable by loving parents." *Ridley School Dist. v. M.R.*, 680 F. 3d 26, 269 (3d Cir. 2012). (GSD br., p. 17, fn. 3). However, *Ridley* clarifies that the district "must supply an education that provides 'significant learning' and 'meaningful benefit' to the child." *Ridley,* at 269 (citations omitted). The ALJ correctly found that J.L.'s severe writing and work completion challenges, which were unmet by the district on an ongoing basis, denied him such learning and benefit, and thereby denied him FAPE.

This is not a case in which the parent is disputing the educational methodology of the district, as the GSD suggests. (GSD br., p. 18). Rather, this is a matter of a district who resisted a parent's efforts to find out how he was doing, masked his inability to write anywhere near grade level, and failed to implement an inadequate IEP. It is for all those reasons that the ALJ legitimately ordered the GSD to reimburse L.L. for her placement of her son at Brehm.

The district alleges that it is likely to succeed on the merits due to what it incorrectly perceives to be the ALJ's flawed analysis of one witness' testimony. (GSD br., pp. 18-19). Yet, the district fails to acknowledge that in the one paragraph in which the ALJ discusses Susan Carneol's testimony in a 24 page single spaced decision, the ALJ specifically found that,

> While the District was not legally obligated to provide the Student with the optimal or best special education services, it also should not have been providing the Student with insufficient services to meet his individual needs and that allowed him to make merely *de minimus* progress. For the 2017-18 school year, the District **reduced** the Student's speech and language services in half, to 20 minutes only once per week, despite the Student continuing to

25

have difficulties in that area. Also concerning was the fact that the District's speech and language pathologist testified that she sometimes had to pull the Student out of the special-education supported study hall to provide him with speech and language therapy, meaning that he then did not receive the study hall services.

(ALJ Amended Decision, p. 17) (emphasis supplied).

Thus, it is patently false for the GSD to claim that the ALJ relied upon the testimony of Susan Carneol alone. Rather, she understood that testimony in the context of the overall failure of the GSD to provide FAPE to J.L.

In discussing the ALJ's finding that J.L. failed to meet half of his 2017-18 IEP goals which were then either continued or watered down in his 2018-19 IEP, the district once again leaves out key findings in the ALJ's decision. (GSD br., p. 20). In addition to these admittedly important findings, she noted that the baseline for his advocacy, work completion and writing goal was **zero**, which means he had made absolutely no progress. While it is true that if the student is making progress, the court may possibly find that the student received FAPE, in the case at bar, J.L. did not make any progress on these three critical goals. Accordingly, the ALJ's finding, to which the court must defer, was proper.

It is not the case described by the district that the parent refused to cooperate with the finalization of the IEP and therefore, it should not be considered. (GSD br., p. 21). As mentioned previously and as the ALJ found, the district had complete control over the IEP process and simply failed to carry out its duty to modify the May 2018 IEP if it felt a need to do so. It neither scheduled nor held an IEP meeting to which the parent failed to attend.

While it is true, as the district notes, that J.L. made some progress at

26

Lindamood-Bell, that progress does not save the district's case. (See GSD br., p. 20). In fact, although J.L. made some progress in the weeks he spent at Lindamood-Bell, as set forth above, and as the ALJ noted in her decision, he was still writing at a 4th grade level as he was preparing to enter the 11th grade.

The GSD then goes on to suggest that there is a strong likelihood that it will prevail by demonstrating that J.L.'s placement at Brehm was inappropriate. Once again, it parses the ALJ's decision on this issue by alleging that her finding that Brehm was appropriate was conclusory. (GSD br., p. 21). Yet, the district ignores the extensive fact finding the ALJ set forth regarding the vastly increased specialized services, which Brehm provides J.L. as compared to the district. (See ALJ Amended dec., pp. 15-16) and that she found that based on credible testimony, he was making progress there. *Id.,* at 22.

The Supreme Court has found that "reimbursement for the cost of private special education" is appropriate "when a school district fails to provide FAPE." *Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 239 (2009). The standard for the private school is simply "suitable" for the child. *Id.* at 247. The school does not need to meet IDEA standards or requirements. *Florence County School Dist. Four v. Carter,* 510 U.S. 7, 13 (1993).

Indeed, as in the case at bar, *"*parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement." *School Comm. of Burlington v. Dept. of Ed. of Mass.*, 471 U.S. 359, 370 (1985). That decision goes on to state that for parents who are willing and able to

place their child in a private school, "it would be an empty victory to have a court tell them….that they were right but that these expenditures could not be reimbursed by school officials." *Ibid.*

A parental placement at a private school is one that is "likely to produce progress, not regression." *Gagliardo v. Arlington Central Sch. Dist.,* 489 F. 3d 105, 112 (2d Cir. 2007) (citations omitted). In this instance, the ALJ cited solid evidence that J.L. is making progress at Brehm.

The parental private placement must simply provide, "educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *Gagliardo,* at 112. Although the GSD asserts otherwise, there can be no doubt that Brehm is a perfect match for J.L.'s unique needs and the ALJ was sufficiently clear in her decision which relied on credible testimony, when she ordered the GSD to reimburse L.L. for his placement there.

Finally, it is unlikely that the court will reduce the reimbursement amount based on an alleged lack of cooperation of the parent. The ALJ's decision is clear and proper. It is the district, which failed to convene an IEP meeting to modify the May 2018 IEP, and L.L. never failed to attend an IEP meeting that was duly scheduled and noticed. The district cannot take advantage of its own failure to schedule an IEP meeting by blaming the parent for the district's failure.

It is important to bear in mind that since, "a diligent school district…is always able to tender to recalcitrant parents a final IEP that incorporates any rejected oral offers that it may have extended during the consultative process," reliance on the

written IEP should not disturb the balance of equities. *Systema ex rel. Systema v. Academy School Dist. No. 20*, 538 F. 3d 1306, 1316, fn. 9 (10th Cir. 2008). This is not a case such as that cited by the GSD, where the parent refused to make the child available for the district's evaluation. *Patricia P. v. Bd. of Educ. of Oak Park and River Forest High Sch. Dist. No. 200*, 203 F. 3d 462 (7th Cir.) (GSD br., p. 23).[4]

### 2.    The ALJ's decision is entitled to deference.

The parties agree that the ALJ's decision must be given "due weight." (GSD br., p. 26). While the court may review and overturn errors of law and clearly erroneous findings of fact, the district's allegations that the ALJ made such errors, as clearly rebutted above, simply have no merit. The ALJ issued a highly detailed 24 page single spaced decision, thoroughly citing to the extensive record. Moreover, she appropriately applied the *Endrew F.* standard, as well as the standard for reimbursement. For the reasons previously described, her decision merits the due weight it must be accorded and is likely to be upheld in its entirety, when the court reviews this case on summary judgment.

### 3.    The District will not suffer irreparable harm without an injunction.

The district's claims that it will be irreparably harmed because, without evidence, it claims that it "might not be able to recover any funds it pays to the Parent" should it prevail when this court makes its decision on summary judgment.

---

[4] The GSD's citation to *C.H. v. Cape Henlopen School Dist., 606 F. 3d 59, 70-71 (*3d Cir. 2010) is inapposite as in that case the parents unilaterally withdrew their child from public school without notice, which is not the case here where L.L. provided the statutorily required 10 day notice of withdrawal, and the GSD still failed to reconvene an IEP meeting before he was unilaterally placed at Brehm, in order to address the parent's concerns. (See GSD br, pp. 25-26).

(GSD br., p. 27). The truth of the matter, however, is that the parent has been paying

tuition for her son to attend Brehm for well over a year so she clearly has the

capacity to reimburse the district if the court does not issue an injunction. Moreover,

she can be required to provide a letter of credit to protect the district's financial

interest, if necessary. Accordingly, the district has not provided the court with any

evidence that L.L. will abscond with its money if she is required to reimburse it, and

through a bond, the district's unsubstantiated fears can be resolved.

### 4. The Balance of Harms Lies in Favor of the Parent and Student.

The district claims the parent has not been harmed by its failure to pay for

Brehm, because the parent has already been paying for that tuition. While it is

premature for the court to award prejudgment interest at this time, the fact that the

parent is paying interest on loans in order to pay her son's tuition at Brehm, is

indeed a real harm to her, and the harm will increase until this court's final order

and judgment if it issues an injunction staying the ALJ's order.

Indeed, should this case drag on beyond the parent's ability to pay for tuition

at Brehm, there is a real risk of irreparable harm to J.L. if he is forced to leave Brehm

and return to the GSD. This district court has found that the balance of harms when

it comes to denying necessary special education lies in favor of the student. *M.R. v.*

*Milwaukee Public Schools,* 495 F. Supp. 864, 870 (E.D. Wis. 1980).

The district, on the other hand, has failed to present a shred of evidence that

it has any financial hardship to comply with the ALJ's order. It does not claim that it

would have to borrow funds or that it does not have the funds. It simply articulates

an unsubstantiated fear that it will not get paid back if the court orders the parent to

do so. As stated above, that can easily be remedied with a letter of credit or a nominal bond.[5]

### 5.    The Public Interest does not support an injunction.

The district fails to cite a single IDEA case, which suggests that the public interest supports an injunction because there are none. While the district repeats its unsubstantiated fear that it might not get paid back, if the court orders the parent to do so, that fear has no factual basis, and can be remedied by the court requiring the parent to provide a letter of credit. Thus, the public interest does not support an injunction. If anything, the public interest supports school districts' compliance with the IDEA.

### B.    If the Court Grants an Injunction, the District Must Obtain a Bond.

Fed. R. Civ. P. 65(c) is clear and unequivocal. The court may only issue an injunction, "if the movant give security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." While it may not be reversible error to fail to require a bond, such a waiver should only be done when the party seeking the injunction has demonstrated a strong likelihood of success on the merits. *Scherr v. Volpe,* 466 F. 2d 1027, 1035 (7th Cir. 1972). As explained above, the district has minimal, if any chance of succeeding on the merits, so in addition to the fact that the court should not issue an injunction, if it is so inclined to do so, it should follow the clear unequivocal language of Fed. R. Civ. P. 65(c) and require the district to post a bond.

---

[5] This bond can be nominal, as the court required a $10 bond from a parent pending appeal. *Board of Education of Oak Park & River Forest High School Dist. No. 200, v. Illinois State Board of Ed.,* 10 F. Supp. 2nd 971, 982 (N.D. Ill. 1998).

31

Moreover, when a bond is waived, the Seventh Circuit has ruled that some form of alternative security should be ordered. *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 786 F. 2d 794, 799 (7th Cir. 1986). While the district has failed to articulate why it cannot post a bond, should it do so, the court should require alternative security.

## VI.     CONCLUSION

Therefore, for the reasons set forth herein, and based on the record as a whole, the court should deny plaintiff's motion for a preliminary injunction. In the alternative, if the court grants the plaintiff's injunction, it should order it to post a bond to secure the funds that it may be required to pay the defendants when the court issues a final decision and order.

Respectfully submitted this 17th day of October, 2019.

<u>s/Jeffrey Spitzer-Resnick</u>
Jeffrey Spitzer-Resnick
Attorney for Defendants J.L. and L.L.
Systems Change Consulting, LLC
430 Sidney St.
Madison, WI 53703
(608) 206-7164
jspitznick@gmail.com