# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

GRAFTON SCHOOL DISTRICT,
           Plaintiff,

    v.                                        Case No. 19-C-1179

JL, a minor, by and through his parent
and next friend, LL,
           Defendant.

## <u>ORDER</u>

This is an appeal under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, and its implementing regulations, 34 C.F.R. Part 300, from an administrative law judge's decision requiring the plaintiff Grafton School District (Grafton) to pay the defendant student's tuition at a private school in which his mother, L.L., unilaterally placed him. The parties have filed cross motions for summary judgment which this order resolves. Though the IDEA allows the parties to offer additional evidence when a case is reviewed by a district court, neither party has offered new evidence, and so I decide the case on the basis of the administrative record. *Evanston Community Consolidated School District v. Michael M.*, 356 F.3d 798, 802 (7th Cir. 2004).

## I.    FACTS

The facts reflected in the administrative record are as follows. The student, J.L., began attending school in Grafton during the 2011-2012 school year, when he was in fourth grade. He is of above average intelligence, with noted strengths in math problem solving and other areas. He has been medically diagnosed with ADHD and an anxiety

1

disorder. He has struggled with writing throughout his years in school. He has had an Individualized Education Plan (IEP) in place since seventh grade, with his eligibility based on Other Health Impairment (OHI). (To be eligible for an IEP, a student must be affected by a disability in one of several categories which include, among others, specific learning disability, speech-language impairment, and other health impairment, or OHI.)

In April, 2016, the spring of the student's eighth grade year, L.L. requested that the district evaluate the student to see if he met the criteria for a speech/language impairment or for provision of speech/language services. An independent evaluator, Susan Carneol, conducted the evaluation but was not able to complete the assessment because J.L. became agitated and oppositional when asked to write or dictate a sentence. Carneol recommended that the student continue to receive special education services and suggested that the IEP team consider adding speech and language as a related service. Carneol referred J.L. for a neuropsychological evaluation, which found that ADHD and anxiety impaired the student's functioning and that his writing had not progressed at age-expected rate since his first neuropsychological evaluation when he was seven years old. The evaluator commented that J.L.'s level of performance in writing was likely reflective of a specific learning disability, but that further monitoring in the school setting would be necessary to determine if J.L. met formal state criteria for the additional special education category.

In June 2016, an IEP team meeting was held to reevaluate J.L. and develop an IEP for his upcoming freshman year of high school. The team determined that J.L. met the eligibility criteria for OHI, but not for speech-language impairment. The team

2

developed an IEP which provided that J.L. would receive the following services: targeted skill work in written language for one class period a day; supervised study in the special education classroom for one class period a day; an assignment notebook accuracy check at the end of every day; and 20 minutes of speech and language services twice per week. The June 2016 IEP also set four goals for the school year in the areas of "Organization," "English 9" (substantively, this goal involved writing a paragraph that met district standards vis a vis content, organization, language, and conventions), "Academic Goals" (i.e., following directions and staying on task), and "Speech-Language."

During the summer of 2016, Grafton hired a private tutor[1] to work with J.L. on writing and language. That tutor recommended to L.L. that J.L. be provided a study hall every day with a teacher with specific training in working with students with both ADHD and problems with written expression, who would understand the way J.L. learned. L.L. emailed Grafton's director of special education requesting an IEP team meeting to implement the tutor's recommendations into J.L.'s IEP. L.L. also offered to pay for a tutor to provide the recommended services. However, Grafton did not revise J.L.'s IEP in response to this request.

In May, 2017, at the end of the student's freshman year, L.L. asked J.L.'s case manager, Adam Heitzkey, to have J.L.'s writing evaluated. It is not clear from the record whether this evaluation happened. However, the IEP team did meet again at the end of May, 2017 to review and revise J.L.'s IEP and develop the IEP for his sophomore year. The new IEP provided that J.L. would receive the following services: a daily study hall

---

[1] Grafton hired this tutor as compensatory education because it had failed to provide the student with one of the services required under his eighth grade IEP.

3

supported by special education staff; a daily assignment notebook check; and 20 minutes once per week of speech and language services (half the amount of speech-language services that had been provided the year before). The May 2017 IEP listed six goals, four of which were identified as "Advocacy," "Attending-Behavior," "Academic Goals-Work Completion," and "Writing," and the remaining two of which were related to the speech-languages services J.L. received.

Notably, the writing goal in the May, 2017 IEP was nearly identical to the English 9 goal from the year before, again envisioning that the student would write a paragraph that would meet the previously identified district standards for content, and conventions. The IEP's stated baseline for this goal (meaning the student's level of achievement at the time the IEP was written) was that he could independently meet this goal 25% of the time. The level of achievement targeted in the IEP was 60% of the time. Similarly, the goal related to Attending Behavior was substantively very similar to the academic skills goal from the IEP the year before. The May 2017 IEP set the baseline for attending behavior as the student responding appropriately to redirection in 2 out of 5 instances, and set the target attainment level as appropriate response to redirection in 4 out of 5 instances.

The May 2017 IEP provided that the student would receive various supplementary services. These included: extended time on all writing assignments of a paragraph or more; paragraph outlines to help the student organize his thoughts prior to writing paragraphs/essays in communication arts; access to work processing technology for writing assignments that are a paragraph or more and will be graded for spelling, grammar and organizational accuracy; and speech-to-text and word prediction software to facilitate

4

writing tasks. In addition, the May 2017 IEP also required that quarterly reports about J.L.'s progress be provided to L.L. However, Mr. Heitzkey did not provide the required quarterly reports.

In November 2017, L.L. asked to convene an IEP team meeting to review J.L.'s IEP, based on her concern that he was not getting his English writing assignments done and had received D and F grades on some assignments. An IEP team meeting was held, but no revisions were made. In an email to a high school administrator dated November 14, 2017, L.L. asked the district to evaluate J.L.'s writing ability. On February 17, 2018 and March 27, 2017, L.L. again emailed Mr. Heitzkey to request that the district evaluate J.L.'s writing. In April 2018, a member of the district staff assessed J.L.'s writing and found that his paragraph was written at a third to fourth grade level.

J.L. received passing grades during his sophomore year, including As in certain math and science classes. In American literature and composition, he received a C first semester and a C- second semester. In that class, students' grades were based on five skill areas: speaking, writing, creation, analysis and comprehension; however the co-teachers for the class, Mr. Heitzkey and Helen Kunick, did not factor J.L.'s writing into the grades they assigned him. Ms. Kunick later testified that because of the "infrequency and reluctance" of J.L.'s writing, she could not establish "a mode or trend in learning" in the area of writing and therefore did not include it in the grade.

J.L. did not utilize or fill out his assignment notebook during the 2017-18 school year. On May 20, 2018, the district's online gradebook software showed that J.L. had 44

5

missing assignments for the school year. He also resisted using the speech-to-text software that had been provided to him as a supplementary service in his IEP.

On May 23, 2018, the IEP team met to review J.L.'s IEP and develop the IEP for the next year. Mr. Heitzkey presented a draft to L.L. at the start of the meeting. Included in the draft was a review of the goals that had been set for the 2017-18 school year, which indicated that J.L. had not met the goals related to advocacy, attending, and writing.

The IEP team did not finish developing the IEP for the 2018-19 school year at the May 23, 2018 meeting, though it did draft the goals for the upcoming year. Again, there were six goals. Four were labeled "Advocacy," "Attending," "Writing" and "Study Skills," and the remaining two again related to J.L.'s work with the speech-language pathologist. Regarding special education services, the draft IEP again provided for a daily study hall in the special education classroom with instruction in writing skills, time management, and organization, as well as 20 minutes per week of speech-language services. The daily assignment notebook check that had been provided in the previous year's IEP was not included in the draft.

At the end of the May 23 meeting, the team tentatively discussed reconvening in June to finalize the IEP. On May 31, 2018, the district's school psychologist emailed L.L. and told her that because the district was legally required to complete the annual IEP revision and review by May 31, the IEP that was partially completed at the May 23 meeting would be in effect as a placeholder until the team reconvened to finalize the IEP.

After the May 23 meeting, J.L. showed L.L. how to see the editing history of his written assignments on Google Docs. Based on what L.L. saw, she believed that Mr.

Heitzkey had written or altered much of J.L.'s writing on assignments and exams, and that the conduct constituted illegal forgery or fraud. She asked the district to investigate and also reported the conduct to local law enforcement.

At the May 23 meeting, the IEP had tentatively discussed providing summer programming for J.L. but had not reached a decision. Regardless, in June 2018, L.L. signed J.L. up to receive writing instruction at Lindamood-Bell, a private educational center, over the summer. She sent an email to the district demanding that it pay the cost of those services. Specifically, she wrote:

> As I mentioned the school will be paying for [J.L.'s] 4 to 5 weeks of Lindamood Bell this summer starting 7/9/18 and we can see when they do their re evaluation, if [J.L.] will require more through out his school career in conjunction with other services.
>
> Please get back to me or have your attorney contact me by Friday June 22nd at 4 p.m. to confirm you are covering Lindamood Bell $2440/wk and [J.L.'s] transportation, so I can leave this out of the legal consultation vs you having to pay for it (and you will) and a lot of extra legal fees. I want to make sure the transportation is set up or you will need to reimburse me at an extremely high rate.

ECF No. 27-15 at 2., Laura Stautz, the district's new director of special education, responded and indicated that the district would to pay for four weeks of instruction as well as transportation. *Id.*at 4. In the same email exchange, L.L. and Stautz discussed when to reconvene the IEP team to finalize the 2018-19 IEP. Stautz recommended that the team reconvene after J.L. had completed the services at Lindamood-Bell so that information from that program could be incorporated into the plans for J.L.'s writing

7

instruction in the upcoming school year. L.L. replied that she agreed to reconvene after Lindamood-Bell had completed its final evaluation of J.L. in August. *Id.* at 4.

On August 13, 2018, Laura Stautz emailed L.L. to set up a meeting to finalize J.L.'s IEP. ECF No. 27-17 at 2. L.L. replied in a long email later that day. *Id.* at 3. The email first asked whether Heitzkey was still employed by the district. It also asked for the names of the special education teachers currently employed at the high school who would be available to work with J.L. It indicated that the Lindamood-Bell evaluation results would be available August 23. The email requested "information on what [the district was] willing to put in place; services, people, hrs. etc," and indicated that L.L. would "consider it and then you can have the IEP team bless it." *Id.* However, the email then stated, "I won't have Heitzkey anywhere near my son, so until you fire him we have a problem." The email then spent several paragraphs discussing the Grafton Police Department's investigation into L.L.'s fraud and forgery allegations against Heitzkey.

Laura Stautz replied in an email on August 15. She again requested information about L.L's availability for an IEP meeting and suggested that the meeting be scheduled for August 24, since the Lindamood-Bell results would be available August 23. ECF No. 27-17 at 5. Stautz also indicated that the District had investigated the allegations against Mr. Heitzkey and had not been able to substantiate them, but requested that L.L. provide any evidence that she had to substantiate the allegations. *Id.* Stautz informed L.L. that, because of the allegations and L.L.'s insistence that she "wouldn't have Heitzkey anywhere near her son," Heitzkey would no longer serve as J.L.'s special education

teacher. L.L replied later that day, listing several grievances against Heitzkey and calling him a liar. She stated, "I have raised my kids not to lie or be around liars. . . . So until Heitzkey is gone and you decide you really want to help my son we won't need an IEP meeting. You will be paying for a unilateral placement as I said before." *Id.* at 7. L.L. did not provide dates that she would be available for an IEP meeting.

On August 17, L.L. emailed District Superintendent Jeff Nelson, notifying him that she intended to remove J.L. from the district and place him at Brehm Preparatory School in Carbondale, Illinois on September 4, 2018 or before and that she would be seeking reimbursement from the district for the cost of the student attending the private school. Laura Stautz replied in an email acknowledging the district's receipt of L.L.'s email and asking if L.L. would be interested in a facilitated IEP meeting or engaging in mediation with the district. L.L. declined.

J.L. began school at Brehm in September. Brehm is a residential program for students with learning challenges. During the 2018-19 school year at Brehm, J.L. received speech and language services each day for a total of 96 minutes per week. He also received speech and language services from a second therapist in a small group setting for 47 minutes twice a week. He received daily executive function and advisement services totaling 100 minutes per week. He also received general academic instruction and other services.

The Grafton Police department closed its investigation into Mr. Heitzkey, concluding that the allegations were a civil rather than a criminal matter.

In January, 2019, L.L. filed a request for a due process hearing, seeking reimbursement from the district for the cost of J.L.'s Brehm tuition and transportation costs. An administrative law judge (ALJ) conducted the hearing in March and April, 2019. In July, 2019, the ALJ issued a decision and order which concluded that the district had failed to provide J.L. with a free, appropriate public education during the 2017-18 school year, had failed to offer him one for 2018-19, and was obligated to reimburse the parent for the costs of J.L.'s placement at Brehm. It is the district's appeal of this order that is now before me.

## II.    STANDARD OF REVIEW IN IDEA CASES

The IDEA provides that when a district court reviews an ALJ's decision in an IDEA case, it "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. §1415(i)(2)(C). However, where, as here, neither party requests that the district court hear additional evidence, I must afford the administrative law judge's decision significant deference and may overturn it only if I am "strongly convinced that the order is erroneous." *School Dist. of Wisconsin Dells v. Z.S. ex rel. Littlegeorge,* 295 F. 3d 671, 675 (2002). Further, I am not to substitute my own notions of sound educational policy for those of the school district. *Evanston Community Consolidated School Dist. Number 65,* 356 F.3d at 802.

## III. DISCUSSION

A state that receives federal funds under the IDEA must provide a free appropriate public education, or "FAPE," to all eligible children. 20 U.S.C. § 1412(a)(1). "When a public school fails to provide a FAPE and a child's parents place the child in an appropriate private school without the school district's consent, a court may require the district to reimburse the parents for the cost of the private education." *Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 232 (2009). However, the court "retain[s] discretion to reduce the amount of a reimbursement award if the equities so warrant." *Id.* at 247. Here, the District makes the following arguments that it should not have to reimburse L.L. J.L.'s Brehm tuition: (1) it provided J.L. a FAPE during the 2017-18 school year and it offered him one for 2018-2019; (2) Brehm was not an appropriate placement for J.L.; and (3) the equities warrant reduction or denial of reimbursement. I will address these issues in turn.

A. Substantive Compliance with the IDEA's FAPE Requirements

The ALJ determined that the District did not provide J.L. with a FAPE during the 2017-18 school year or offer him one for 2018-19. The District disagrees on both points. I begin my discussion with a review of the IDEA's substantive requirements with respect to provision of a FAPE.

The vehicle by which a FAPE is delivered to an individual child is the IEP, which must be reviewed every year and which must describe the child's present level of achievement as impacted by the child's disability, set out measurable annual goals, and describe the special education and related services that the school will provide so that the child may make progress both towards the individualized goals and, to the extent

11

possible, in the general curriculum. *Endrew F. ex rel. Joseph F. v. Couglas County School Dist.*, 137 S.Ct. 988, 994 (2017); 20 U.S.C. § 1414(d)(1)(A)(i). What services are provided in the IEP will vary significantly from child to child; however, to meet the substantive requirements of the IDEA, an IEP must be "reasonably calculated to enable a child to make progress adequate in light of the child's circumstances." *Endrew F.*, 137 S.Ct at 999.

What constitutes "adequate progress" will also necessarily very from child to child, but the Supreme Court has provided some guidance. In the case of a child who is fully integrated in the regular classroom, an IEP "typically should . . . be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *Id.*, quoting *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 203-204 (1982). In the case of a child "not fully integrated into the regular classroom and not able to achieve on grade level," the IEP should be "appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Endrew F.*, 137 S.Ct. at 1000. The Supreme Court has, however, rejected the argument that a FAPE must provide a child with a disability the opportunity to "achieve academic success, attain self-sufficiency, and contribute to society that are substantially equal to the opportunities afforded children without disabilities." *Id.* at 1001. In other words, the substantive equality between disabled and nondisabled students required by the IDEA is not an equality of outcomes or even the opportunity to attain equal outcomes; it's rather an equality of opportunities for growth relative to the child's own unique starting point. In the Court's

12

words, "the goals may differ, but every child should have the chance to meet challenging objectives." *Id.*

It is not enough that an IEP be adequately written; it must also be adequately implemented. A material failure to implement an IEP violates the IDEA. *Van Duyn ex rel. Van Duyn v. Baker School Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007) (*cited in CTL ex rel. Trebatoski v. Ashland School Dist.*, 743 F.3d 524, 529 (7th Cir. 2014); *Stanek v. St. Charles Community Unit School Dist. No. 303*, 783 F. 3d 634, 641 (7th Cir. 2015)). "A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." *Id.* A child's lack of educational progress in an area the prescribed service was intended to target may be probative that there has been more than a minor shortfall in the services provided. *Id.*

The ALJ was first asked to determine whether the District had provided J.L. with a FAPE during the 2017-18 school year. She found that it had failed to do so, based on the following findings of fact: the District's reduction of J.L.'s speech and language services to 20 minutes once per week despite specialist Susan Carneol's testimony that 15 or 20 minutes twice a week of spelling and writing intervention would not be sufficient and that best practice would be a minimum of half an hour five days a week; the fact that the goals for J.L.'s 2017-2018 IEP were very similar to those from the year before, together with the fact that the baselines for some of these goals for 2017-18 were very low, suggesting that J.L. had not made progress toward those goals the year before; the fact that J.L. received some F and D grades on writing assignments in the first semester of the 2017-18 school

year and the IEP team met but made no revisions to the IEP; the fact that J.L.'s English teacher together with Mr. Heitzkey decided not to include writing as a component of the grade they gave J.L. for the first semester of English 10 because he did not write enough for them to evaluate his writing ability; Mr. Heitzkey's testimony that by the end of the 2017-18 school J.L. had not achieved several of the goals in his IEP for that year or for the year before; Mr. Heitzkey's testimony that he did not provide L.L. with quarterly progress reports that were required under J.L.'s IEP; the District's director of pupil services' testimony that the District should have granted L.L.'s repeated request to have J.L.'s spelling and writing level evaluated; and the fact that an assessment of J.L's writing in April 2018 found that his paragraph had been written at a third to fourth grade level.

The District argues that the ALJ made a legal error in her assessment of the 2017-2018 school year because she considered evidence of J.L.'s lack of progress through the year, and not just information that was available to the IEP team at the time it wrote the IEP for that year. In support of this argument, the District cites various cases which stand for the principle that an IEP's adequacy must be evaluated prospectively (i.e., whether it was a reasonable plan at the time it was written), rather than in hindsight. ECF No. 28 at 22, citing, *inter alia, M.B. ex rel. Berns v. Hamilton Se. Schs.*, 668 F.3d 851, 859, 863 (7th Cir. 2011); *Lessard v. Wilton Lyndebrough Coop Sch. Dist.*, 518 F.3d 18, 29 (1st Cir. 2008).

The problem with the District's argument is that is it does not address the question the ALJ had been asked to resolve. The ALJ's order frames the issue presented as: "Did the District fail to provide the Student with a free, appropriate public education during the

14

2017-2018 school year?" ECF No. 1-1 at 2. But the District's argument and the cases it cites address only the narrower question of whether the IEP had been adequately written. As discussed above, an adequately drafted IEP is only one component of a FAPE; the IEP must also be adequately implemented, and a student's lack of progress during the year can serve as evidence that an implementation failure was material and deprived the student of a FAPE. *Van Duyn*, 502 F.3d at 822.

It is true that the ALJ's discussion of the legal standards governing her analysis of the 2017-2018 school year addresses only the standards for IEP construction and not IEP implementation. ECF No. 1-1 at 16. But several of the facts the ALJ discusses clearly support a conclusion that the District materially failed to implement provisions of J.L.'s IEP.

First, the IEP provided that J.L. would receive a daily assignment notebook check as a special education service; however, Mr. Heitzkey testified that J.L. did not use or fill out his assignment notebook during the 2017-18 school year. These facts suggest that the IEP provision regarding assignment notebook checks was not implemented. Further, Mr. Heitzkey testified that at the end of the year J.L. was not close to being able to record his daily assignments with 90% accuracy, which was a goal in his IEP. J.L.'s lack of progress towards this goal is evidence that the failure to implement the IEP provision was material and deprived him of a FAPE.

Second, the IEP provided that Mr. Heitzkey would make quarterly written reports to L.L. regarding J.L.'s progress, but Mr. Heitzkey acknowledged that he did not make those reports. J.L's failure to make progress on the writing and work completion goals is

evidence that this failure to implement the IEP's provision for monitoring and reporting his progress was material and deprived him of a FAPE. Relatedly, though the IEP did not explicitly provide that J.L.'s writing would be assessed in the context of his English class, such assessment is implicit in certain of the services for which the IEP did provide, including the accommodations like paragraph outlines and extra time intended to facilitate his completion of writing assignments, as well as the provisions for monitoring and reporting of the students progress towards the IEP's writing goal. That J.L's writing was not assessed in the context of his English class therefore plausibly amounts to a failure to implement those components of the IEP, and, again, J.L.'s lack of progress on his writing goal is evidence that this failure to implement was material and deprived him of a FAPE. In short, it was not improper for the ALJ to rely on the evidence of J.L.'s lack of progress during the 2017-18 to reach the conclusion that the District did not provide him a FAPE during that year.

The District raises various other challenges to the ALJ's decision regarding the 2017-18 school year, including that the ALJ misunderstood speech and language specialist Susan Carneol's testimony and that the ALJ gave an undue amount of weight to L.L.'s perceptions instead of deferring to the judgment of the school district. Because I have already found that the facts before the ALJ were sufficient to support the conclusion that J.L. did not receive a FAPE in the 2017-18 school year, and because I therefore do not find the ALJ's decision to have been plainly erroneous, I need not consider these additional arguments. I will uphold the ALJ's determination that J.L. did not receive a FAPE in 2017-18.

16

The ALJ was also asked to determine whether the District offered J.L. a FAPE for the 2018-2019 school year. She concluded that it did not. The starting point of her analysis was the May 23, 2018 IEP team meeting, at which the team was supposed to review and revise J.L.'s existing IEP and develop the IEP for the 2018-19 school year. The team did not complete its work at this meeting, and it planned to reconvene in the summer to continue revising and developing the IEP. However, the prior IEP was set to expire on May 31, 2018. The ALJ reasoned that when the old IEP expired, the draft from the May 23 meeting became the operative IEP. She further reasoned that, though the school reached out to L.L. in August to set a date for a team meeting to finish developing the new IEP and L.L. did not cooperate in setting a date, the school was ultimately responsible for having an adequate IEP in effect and it should have finished developing the IEP even without the parent's input. Therefore, the ALJ concluded, the May 23 draft stood as the IEP the district offered J.L. for the 2018-19 school year, and it was the document that must be examined to determine if the district offered J.L. a FAPE.

The ALJ then examined the provisions of the May 23 IEP and found that it did not meet the *Endrew F.* standard—i.e., that it was not reasonably calculated to enable J.L. to make progress in light of his circumstances. Among the reasons she cited for this determination were the removal of the daily assignment notebook check from the IEP without offering any replacement services even though J.L. continued to have serious problems with organization and work completion; the inclusion of only 20 minutes per week of speech and language services even though that had proven inadequate the

17

previous year; and the retention of three unachieved goals from the previous year's IEP with baselines set at zero.

The District raises three challenges to the ALJ's reasoning. First, it argues that her assessment of the 2018-19 IEP was tainted by the comparisons she drew to the 2017-18 IEP, which the District had argued was adequate. I have already ruled that the ALJ did not err in finding that the District failed to provide J.L. with a FAPE in 2017-18. I therefore see no error in the ALJ's reasoning that the 2018-19 IEP failed to identify or address the problems that arose in 2017-18.

The District next argues that the services offered in the 2018-19 IEP were adequate because they were similar to the services offered in 2017-18 which had allowed J.L. to achieve passing grades, advance with his class, meet three of his six IEP goals, and—the District claims—make progress on the others. In support of its claim that J.L. made progress on the unmet IEP goals, the District presented Mr. Heitzkey's testimony that J.L. had made "multiple steps in the right direction," ECF # 27-20 at 24-25, and certain lines of commentary from the IEP team's review of the 2017-18 IEP that suggested J.L. had made some progress towards his unmet goals. However, there is also evidence to support a finding that J.L. did not make meaningful progress towards these goals, including the number of assignments he failed to turn in and the fact that he completed so little written work that his English teacher elected not to assign him a writing grade. It was the ALJ's responsibility as fact-finder to weigh such evidence; I will defer to her finding that J.L. did not make appropriate progress towards these goals in 2017-18.

18

The District also cites certain broader indicia of progress in support of the adequacy of the IEP, including the fact that J.L. obtained passing grades and advanced to the next grade level. It is true that, in *Rowley*, the Supreme Court cited passing grades and grade level advancement as indicators of an IEP's adequacy. 458 U.S. at 202-03. That assertion was premised, however, on the passing grades and advancement being accurate reflections of the student's mastery of grade level content. *Id.* at 203 ("When . . . [a child with an IEP] is being educated in the regular classrooms of a public school system, the system itself monitors the educational progress of the child. Regular examinations are administered, grades are awarded, and yearly advancement to higher grade levels is permitted for those children who attain an adequate knowledge of the course material."). Here, J.L.'s English teacher did not factor his writing into his grade, and other tests of his writing showed him writing well below grade level. Thus, for this child, grades and advancement ring hollow as indicators of progress, and it was not erroneous for the ALJ to base her determination regarding J.L.'s appropriate progress—whether he had made it in 2017-18, and whether he was likely to make it in 2018-19—on other evidence.

Finally, the District argues that the ALJ should have considered evidence beyond the IEP in determining whether the District was prepared to offer J.L. a FAPE in 2018-19. In particular, the District argues the ALJ should have considered the five weeks of specialized programming the District provided to J.L. in the summer of 2018, as well as the services the district was prepared to offer J.L. that were not in the IEP draft. Though the Seventh Circuit has not addressed the question, other circuit courts have held that a

19

court assessing the adequacy of an IEP must consider only what is contained in the document itself. *E.g., Knable ex. rel. Knable v. Bexley School District*, 238 F.3d 755, 768 (6th Cir. 2001); *County Sch. Bd. of Henrico v. Z.P.*, 399 F.3d 298, 306 n. 5 (4th Cir. 2005).

In support of its position, the District points to a First Circuit decision which held that a court's analysis of an IEP's adequacy is not limited to the latest draft of an IEP "where the development of a final IEP has been frustrated by the parent's refusal to cooperate fully in the collaborative process." *C.G. es. Rel. A.S. v. Five Town Community School Dist.*, 513 F.3d 279, 286 (1st Cir. 2008). However, no other circuit has adopted the *C.G.* exception, and the Tenth Circuit has rejected it, on grounds that it gives rise to difficult factual disputes about, e.g., what sorts of services a district might hypothetically have offered a student to achieve substantive compliance with the IDEA. *Systema ex rel. Sytsema v. Academy School District No. 20*, 538 F.3d 1306, 1316 (10th Cir. 2008). Further, the facts in the present case are quite distinct from those in *C.G.* There, the parents refused to see to completion the development of the student's first IEP in the district, and the court found that the parents abandoned the process because they "harbored a fixed purpose" as to the outcome and were unwilling to consider the other possibilities the district proposed. *C.G ex rel. A.S.*, 513 F.3d at 287. Here, on the other hand, the parent had participated for several years—since J.L. was in sixth grade—in processes that yielded final IEPs. And her requests for assessment of J.L.s writing and reevaluation of the IEP during the 2017-18 school year suggest that she was willing to consider other services the district might provide. In short, though L.L. did not cooperate in setting a date for the August 2018 meeting, her participation in the IEP process up to

20

that point does not reflect the sort of obstructionism that was the basis of the *C.G.* court's decision to allow consideration of evidence extrinsic to the draft IEP.

Finally, as the ALJ correctly noted, L.L.'s non-participation in the IEP process did not prevent the District from preparing a final IEP in August 2018; the District "could have and should have scheduled another IEP team meeting, with or without L.L.'s input." ECF No. 1-1 at 22, citing 34 C.F.R. § 300.322(d); *see also Sytsema*, 538 F.3d at 1316, n.9 (noting that application of the four-corners rule even in cases of parental non-cooperation "should not disadvantage a diligent school district because it is always able to tender to recalcitrant parents a final IEP that incorporates any rejected oral offers that it may have extended during the consultative process"). For these reasons, I conclude that the ALJ was correct to consider only what was within the four corners of the draft IEP in concluding that the District had not offered J.L. a FAPE for the 2018-19 school year.

B. Appropriateness of Placement at Brehm

The District challenges the ALJ's determination that the placement at Brehm was appropriate. It argues that the ALJ did not articulate the standard she was applying when making the assessment. However, the standard for appropriateness of a private placement is substantively identical to that for appropriateness of a public school's provision of services. *See Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d. Cir. 2007)("[T]he same considerations and criteria that apply in determining whether the school considerations and criteria that apply in determining whether the school district's placement is appropriate should be considered in determining the appropriateness of the parents' placement . . . The issue turns on whether a placement—public or private—is

reasonably calculated to enable the child to receive educational benefits."); *Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 25 (1st Cir. 2007)("[A] private placement need provide only 'some element of the special education services' missing from the public alternative in order to qualify as reasonably calculated to enable the child to receive educational benefit.")(quoting *Berger v. Medina City School Dist.*, 348 F.3d 513, 523 (6th Cir. 2003)). I note that *Gagliardo, Mr. I.*, and *Berger* were each decided before *Endrew F.*, and in light of *Endrew F.* the rule statement quoted here should be revised from "receive educational benefits" to "make progress appropriate in light of circumstances." The point, however, is that the standard for both public and private placements is substantively the same. The ALJ's discussion of the *Endrew F.* standard thus addresses the adequacy of both the services provided by the District and those provided by Brehm.

Further, the ALJ found facts sufficient to support the conclusion that the services provided at *Brehm* were reasonably calculated to allow J.L. to make progress: for example, she found that at Brehm he received over 140 minutes per week of speech and language therapy, and 100 minutes per week of support in "problem-solving, organization, time management" and other skills related to executive function. ECF No. 1-1 at 17. For these reasons, I affirm the ALJ's conclusion that the placement at Brehm was appropriate.

C.   Equitable Considerations

A court may limit or deny tuition reimbursement to which a parent is otherwise entitled on the basis of equitable factors." *Forest Grove School Dist.*, 557 U.S. at 247. The District argued to the ALJ that L.L. should not be reimbursed because she

unreasonably sought to have Mr. Heitzkey fired in the course of IEP negotiations, and because she was unreasonable when she did not cooperate in setting the August 2018 IEP team meeting. The ALJ rejected these arguments, finding that the failure to respond to the District's request to set a date for an IEP team meeting did not rise to the level of unreasonableness that would justify denying her otherwise legally valid request for reimbursement, and finding that, while L.L.'s anger at Mr. Heitzkey was excessive, her decision to place J.L. at Brehm was based only to a small extent on Mr. Heitzkey's conduct and was not unreasonable in light of her documented, longstanding frustration with her student's lack of progress in the district. The District now challenges these findings.

The District cites *Patricia P. v. Board of Educ. of Oak Park*, 203 F.3d 462, 469 (7th Cir. 2000) for the principle that a parent who fails to cooperate with an IEP team forfeits their claim for reimbursement for a unilateral private placement. ECF No. 28 at 49. However, *Patricia P.* is factually distinguishable. In that case, the parent transferred the student to a private placement before the school district had had any opportunity to evaluate the student and determine her needs. *Patricia P.*, 203 F.3d at 469. And stated fully, the rule announced by the Seventh Circuit in that case is that "parents who, because of their failure to cooperate, do not allow a school district a reasonable opportunity to evaluate their disabled child, forfeit their claim for reimbursement for a unilateral private placement." *Id.* Here, however, the parent gave the school district ample opportunities to evaluate the student. Indeed, in the 2017-18 school year, L.L. actively requested to have J.L.'s writing evaluated, but the district first delayed the re-evaluation and then, as the

ALJ found, failed to adequately revise the IEP in response to the results of the evaluation. *Patricia P.* therefore does not compel reversal of the ALJ's determination regarding cooperation.

Other than *Patricia P.,* the District cites no legal authority compelling a different assessment of the equities. The heart of the District's remaining argument is that L.L.'s conduct in the summer of 2018 was egregious, and that her animus against Heitzkey improperly informed her decision to place J.L. at Brehm. The ALJ acknowledged these arguments in her decision, but found that in light of the long history of L.L. attempting to communicate her concerns to the district without effect, L.L.'s conduct in the summer of 2018 did not shift the equities with respect to her right to reimbursement.

With one exception, I see no error in the ALJ's determination that the District's years of failure to adequately assess and serve J.L. despite L.L.'s ongoing advocacy tilt the balance of equities in L.L.'s favor, outweighing even her vitriol towards Heitzkey and non-cooperation during the summer of 2018. I do, however, find that the ALJ erred in not considering the District's provision of services at Lindamood-Bell as a factor in the equitable balance. The documentary record is clear that the District agreed to pay for the Lindamood-Bell services with the understanding that any evaluations or insights about effective strategies it yielded would be factored into J.L.'s IEP when the team met in August 2018. ECF No. 27-15 at 4. L.L. also clearly indicated to the District that she agreed with this plan; on June 26, she replied to Laura Stautz stating "J.L. is scheduled to redo the entire Lindamood Bell evaluation . . . on August 16th . . . . I agree to reconvene after the evaluation is received." *Id.* That L.L. did not follow through on the post-evaluation IEP

24

discussion after the District had paid for the summer of services smacks of bad faith. Therefore, while I affirm the ALJ's decision that the District is obligated to reimburse L.L. for the costs of J.L.'s education at Brehm, I will order that such reimbursement be reduced by the amount the district spent on tuition and transportation to provide services to J.L. at Lindamood-Bell during the summer of 2018.

## IV. CONCLUSION

For the reasons above, **IT IS ORDERED** that the plaintiff's motion for summary judgment (ECF No. 26) is **DENIED** and the defendant's motion for summary judgment (ECF No. 29) is **GRANTED,** except that the amount of the tuition reimbursement owed by the plaintiff to the defendant shall be reduced by the amount the plaintiff spent on defendant's tuition and transportation at Lindamood-Bell during the summer of 2018.

**IT IS FURTHER ORDERED** that the plaintiff's motion for a preliminary injunction (ECF No. 14) is **DENIED AS MOOT.**

The clerk of court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 8th day of July, 2020.

s/Lynn Adelman
LYNN ADELMAN
District Judge

25